FILED
IN CLERKS OFFICE
2006 APR -3 A 10: 46
U.S. DISTRICT COURT
DISTRICT OF MASS.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

**SUFFOLK, SS** **DOCKET NUMBER 05-CV-11350-MLW**

| | | |
|---|---|---|
| **RICHARD LIVINGSTON** | * | |
| | * | |
| **Plaintiff, Pro Se** | * | |
| | * | |
| **Vs.** | * | |
| | * | |
| **MORTGAGE SERVICE CENTER, INC.;** | * | |
| **CUMEX, INC.;** | * | **PLAINTIFFS MOTION IN OPPOSITION TO DEFENDANTS MORTGAGE SERVICE CENTER, ET AL MOTION TO DISMISS** |
| **RAH FEDERAL CREDIT UNION;** | * | |
| **CHITTENDEN BANK AND** | * | |
| **VICTORIA SCHEPPS** | * | |
| | * | |
| **Defendants** | * | |

Pursuant to Rule 12 of the Federal Rules of Civil Procedure the Plaintiff, Pro Se, Richard Livingston opposes the Defendants Motion to Dismiss for the following reasons:

The Plaintiff will sustain his claim. The aggregate of facts give rise to a right enforceable by the U.S. Federal District Court. The Plaintiff, Pro Se, Richard Livingston will show the existence of a right for damages.

The case at hand has grown out of Probate/Divorce and Bankruptcy Courts action which give rise to the Plaintiff, Pro Se, Richard Livingston assertion of a right to property interest encumbered by and through deceptive banking lending practices, false and material misrepresentation, deliberate

misrepresentation, concealment, contrivance, non-disclosure of the material facts, etc…

- **FTC Act Claims (Counts 10-13) - Bank Fraud (Counts 14-17) – M.G.L. 93A**

A violation of the FTC federal statutes constitutes a violation of the Massachusetts Consumer Protection Act, GL 93A. The FTC Act, the Massachusetts Consumer Protection Act 93A prohibits deceptive acts and practices. The Massachusetts legislature determined that the public would benefit by allowing suits. 436 Mass. 53 (2002), Ciardi v. F. Hoffman-La Roche, Ltd.,
*(See Exhibit A* 436 Mass. 53 (2002),Ciardi v. F. Hoffman-La Roche, Ltd.*)*
*(See Exhibit B Articles on* Ciardi v. F. Hoffman-La Roche, Ltd.)
*(See Exhibit C Amici Brief AIDS Law Project Et Al PG 13 Paragraph 2*)

- ***Bankruptcy - Stay of Execution (Counts 18-21)***

The plaintiff contest Page 2 Paragraph 3 of the Defendants Motion to Dismiss quote, "the bankruptcy court lifted the stay so that Ms Clifford could pursue her rights against the Plaintiff in the divorce proceeding, including her right to refinance the divorced couple's former marital home." The United States Bankruptcy Court District of Massachusetts Hon. Judge Joan N. Feeney was clear and concise in her order "…assert her rights … …described in Livingston v. Livingston, Norfolk County Probate and Family Court, Docket No. 97D1237-D1"
*(See Exhibit D Bankruptcy court order dated 4/24/01)*

No where did the lifting of the Stay of Execution, the Divorce Contract, or District Court allow a third mortgage before refinancing. The Banks Agent Attorney Schepps' referred to this third mortgage as a "second-second mortgage" before Probate & Family Court in an attempt to disguise what it was - a violation of the Court Orders.
*(See Exhibit E – Victoria Schepps Norfolk County Probate & Family Court Transcript September 20, 2001 page 8-16, Note page 15)*

No where did the Bankruptcy and District Court orders allow a violation of the Divorce Agreement Contract to permit the Banks or Ms Clifford to use the equity in the marital estate to pay off Ms Clifford's personal debt in concert with the refinancing. This act encumbered the Plaintiff, Pro Se, Richard

Livingston's equity interest in the property beyond the courts intent and violated the contract law provision of the Divorce Agreement.

- **Pendent State Law Claims (Counts 1-4, and 6-9)**

Plaintiff, Pro Se, Richard Livingston, joins a federal claim with a state law claim based on a common nucleus of operative fact. This is a federal case of Diversity because the interstate lending and banking practices of using "trade name" enterprises, D/B/A a financial institution under the sanctity and security of a Vermont Corporation in the Commonwealth of Massachusetts should be held accountable for violations of a MGL 93A. It is a garden variety David and Goliath case, where the Defendant Mortgage Service Center Inc., Cumex, Inc., RAH Federal Credit Union, Chittenden Bank, Victoria Schepps can consolidate resource with the best and brightest attorney's from the most prestigious law firms in the Commonwealth of Massachusetts to block full disclosure of mortgages on Plaintiff, Pro Se, Richard Livingston property at 15 Quarry Lane, Milton, Massachusetts, County of Norfolk. Plaintiff, Pro Se, Richard Livingston does not have a billion dollar corporation to bank roll his defense. As has been the case for a long time due to the lack of fare representation not of his own active commitment to his case, but the eventual suspension of his Attorney of record. Plaintiff, Pro Se, Richard Livingston has had to rely on his own way-withal and the mercy of the court. Pro Se has been his last resort to right the wrong done by this consortium of high-level banking individuals from the myriad of Banks, Credit Unions, and Mortgage companies. Those of which have harmed him and continue to do so by denigrating Plaintiff, Pro Se, Richard Livingston by demeaning the importance of exposing the fraudulent transactions of a third mortgage and paying non-marital debt. The net proceeds for the refinance were used to pay Ms Clifford's personal debt not in keeping with any of these institution so named as defendants, who's lending guidelines would not permit a direct violation of all that is ethical in business propriety. Thus diminishing Plaintiff, Pro Se, Richard Livingston's asset value to a point greater than the original marital debt, the disbursements made from the proceeds of loan, which did not follow standard bank

lending practice made it greater than 100%. All of which has arisen out of a Divorce has nothing to do with their effort to continue the cover-up of encumbering Plaintiffs property and depriving the Plaintiff, Pro Se, Richard Livingston due process rights.

- **Negligent Hiring and Supervision**
  The Plaintiff, Pro Se, Richard Livingston's claim against Defendant Attorney Victoria Schepps was dismissed in the Stoughton District Court of the Commonwealth of Massachusetts. Now, the Plaintiff, Pro Se, Richard Livingston makes claim under the existence of a federal question based upon a violation of banking laws and Massachusetts General Law, Chapter 93A, Federal Trade Commission Act (FTC Act) which prohibits deceptive acts and practices. There are a few instances, despite Rule 18(a) when initial joinder of a particular claim is not available. In such cases the res judicata myrmidon grudgingly steps aside to allow the Plaintiff to reenter the courthouse door. Here, the Plaintiff, Pro Se, Richard Livingston could not have included his federal theory in the first action because the federal courts have exclusive jurisdiction over federal questions. Consequently, the Plaintiff should not be barred from asserting the federal claim in a later suit. *See Restatement (Second) of Judgments s 26(1)(c)(1982).*

- **Statutes of Limitations**
  The refinancing took place in July 27, 2001. The Plaintiff, Pro Se, Richard Livingston's then attorney filed timely in the U.S. Federal District Court on June 27 2005, all in compliance with the statute of limitations. The Antitrust and Chapter 93A provide a **four**-year statue of limitations.
  *(Exhibit F Unfair Or Deceptive Practices FTC Act/ M.G.L 93A)*
  *(Exhibit G Antitrust Act & M.G.L c. 93A)*

In conclusion, complete exposure of the fraudulent transaction on Plaintiff,

Pro Se, Richard Livingston's property at 15 Quarry Lane, Milton,

Commonwealth of Massachusetts, County of Norfolk, prior to the

refinancing in violation of the Divorce Agreement Contract, Bankruptcy Courts decision; without which a refinancing could not possibly have transpired. Setting in motion fraudulent lending criteria that allowed one of the parties in a Tenant in Common 50% co-ownership (Quit Claim Deed) to take an 80% loan on the jointly owned former marital estate. Thus diminishing Plaintiff, Pro Se, Richard Livingston's asset value to a point greater than the original marital debt, the disbursements made from the proceeds of loan did not follow standard bank lending practice allowing greater than 100%. This Court has the power to pierce the vale of secrecy surrounding the unfair lending practice and fraudulent third mortgage that took place before the refinancing. The creative financing surrounding 15 Quarry Lane, Milton, in the Commonwealth of Massachusetts, County of Norfolk, has been hidden from the light of day by Defendant Mortgage Service Center Inc., Cumex, Inc., RAH Federal Credit Union, Chittenden Bank, Victoria Schepps' who have kept the sun from shining on these files under the guise of Privacy Rights of one co-owner over the other, giving an unfair equity position and controlling interest on the jointly owned property at 15 Quarry Lane, Milton, Commonwealth of Massachusetts, County of Norfolk.

Conundrum is clear if this is the usual and customary business practice would any of these banking institutions give an 80% loan to the other co-owner Plaintiff, Pro Se, Richard Livingston on the same property separated by divorce but not property?

**WHEREFORE,** Plaintiff, Pro Se, Richard Livingston respectfully request that this honorable Court deny the Defendant's Mortgage Service Center, Inc., Cumex, Inc., Chittenden Bank's and RAH Federal Credit Unions Motion to Dismiss.

Date April 3, 2006

Richard Livingston, Plaintiff, Pro Se,

Richard Livingston
149 Warren Avenue
Milton, Massachusetts 02186-2009

617-698-4333 HM

## CERTIFICATE OF SERVICE

I, Richard Livingston, Plaintiff, Pro Se hereby swear and affirm that I have this day

Date 4/3/06 notified Attorney Christopher J. Hunter & David J. Apfel, Legal Representative for Defendant's {**Chittenden Bank,** Burlington, Vermont, **Mortgage Service Center,** Brattleboro, Vermont, **Cumex Inc,** (Credit Union Mortgage Exchange), Lexington, Massachusetts} by United States Postal Service c/o **Goodwin Procter LLP, Exchange Place, Boston, MA. 02190.**

Date April 3 2006

Richard Livingston
149 Warren Avenue,
Milton Massachusetts 02186-2009
617-698-4333

Received by: ____________

Date ________________ Firm Stamp: ______________________________

**AND**

## CERTIFICATE OF SERVICE

I, Richard Livingston, Plaintiff, Pro Se hereby swear and affirm that I have this day

Date 4/3/2006 notified Attorney Harvey Weiner, Legal Representative for Defendant {**RAH Federal Credit Union,** 47 DiAuto Drive, Randolph, Massachusetts 02368-4501} by United States Postal Service c/o **Peabody & Arnold LLP, 30 Rowes Wharf, Boston, MA. 02110.**

Date April 3 2006

Richard Livingston
149 Warren Avenue,
Milton Massachusetts 02186-2009
617-698-4333

Received by: ____________

Date ________________ Firm Stamp: ______________________________

# EXHIBIT A

..., Esq.
Executive Director

SOCIAL LAW
LIBRARY

NOTICE
WARNING CONCERNING
COPYRIGHT REGISTRATIONS

The copyright law of the United States (Title 17, United States Code) governs the making of reproductions of copyrighted material.

Under certain conditions specified in the law, libraries and archives are authorized to furnish a photocopy or other reproduction. One of these specified conditions is that the photocopy or reproduction is not to be "used for any purpose other than private study, scholarship, or research." If a user makes a request for, or later uses a photocopy or reproduction for purposes in excess of "fair use," that user may be liable for copyright infringement.

THIS INSTITUTION RESERVES THE RIGHT TO REFUSE TO ACCEPT A COPYING ORDER IF, IN ITS JUDGMENT, FULFILLMENT OF THE ORDER WOULD INVOLVE VIOLATION OF COPYRIGHT LAW.

Social Law Library, John Adams Courthouse, 1 Pemberton Square, Suite 4100, Boston, MA 02108-1792
Phone: 617-226-1510 Fax: 617-523-2458 Email:copycenter@socialaw.com

howing that the registry's h that the defendant could, owledge of the suspension. argument that registry sent because defendant himself correct address). Where, as edge of license revocation ission, there is no further h prove precisely how that In substance, the Com- higher than that which it ut proper introduction of a gistry. As such, the evidence elming, and we are satisfied e October 17, 1996, notice

*Judgment affirmed.*

doubt that the defendant had actual ked.

VALERIE CIARDI[1] *vs.* F. HOFFMANN-LA ROCHE, LTD., & others.[2]

Middlesex. October 4, 2001. - February 8, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Consumer Protection,* Availability of remedy. *Massachusetts Anti-Trust Act.*

Indirect purchasers could assert claims in a civil action for price-fixing or other anticompetitive conduct under G. L. c. 93A, § 9, even though they had no standing to bring such claims under the Massachusetts Antitrust Act, G. L. c. 93, §§ 1-14A. [56-67] SOSMAN, J., dissenting, with whom COWIN and CORDY, JJ., joined.

CIVIL ACTION commenced in the Superior Court Department on June 29, 1999.

Motions to dismiss were heard by *Margot Botsford*, J., and the matter was reported to the Appeals Court by her.

The Supreme Judicial Court granted an application for direct appellate review.

*Charles Fried* (*Michelle D. Miller* with him) for F. Hoffman-La Roche, Ltd., & others.

*Edward D. Rapacki* (*Fredric L. Ellis & Joseph M. Makalusky* with him) for the plaintiff.

*Joseph F. Ryan*, for Lonza A.G. & another, was present but did not argue.

*Neil P. Motenko*, for Chinook Group, Inc., & another, was present but did not argue.

The following submitted briefs for amici curiae:

[1]Individually and on behalf of others similarly situated. The plaintiff's claims were filed as a class action lawsuit pursuant to Mass. R. Civ. P. 23, 365 Mass. 767 (1974). She purports to represent all Massachusetts consumers who purchased vitamin products supplied by any of the defendants from January 1, 1990, to the present.

[2]Hoffmann-La Roche, Inc.; Roche Vitamins Inc.; BASF A.G.; BASF Corporation; Rhone-Poulenc, S.A.; Rhone-Poulenc Animal Nutrition, Inc.; Rhone-Poulenc, Inc.; Lonza A.G.; Lonza Inc.; Chinook Group, Ltd.; Chinook Group, Inc.; DCV, Inc.; and Ducoa L.P.

*Paul E. Nemser, James C. Rehnquist, & Jaren D. Wilcoxson* for Microsoft Corporation.

*Loretta M. Smith* for New England Legal Foundation.

*Thomas F. Reilly*, Attorney General, *& Judith Whiting*, Assistant Attorney General, for the Commonwealth.

*Stuart T. Rossman* for National Consumer Law Center.

Spina, J. The plaintiff, an indirect purchaser[3] of vitamin products manufactured and distributed by the defendants,[4] brought this action for injunctive relief and damages arising from a price-fixing conspiracy among the defendants.[5] Her complaint alleged coercive civil conspiracy (count I) and unfair or deceptive acts or practices in violation of G. L. c. 93A (count II). Each defendant filed a motion to dismiss the plaintiff's complaint pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). A Superior Court judge granted the defendants' motions to dismiss count I of the complaint but denied their motions to dismiss count II of the complaint.[6] The judge then reported the correctness of her order denying the defendants' motions to dismiss count II of the plaintiff's complaint to the

[3]Indirect purchasers are persons who buy products not directly from their original source but from other parties further down the distribution chain. See *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720, 726 (1977).

[4]These vitamin products include (1) specific vitamins (vitamins A, B, B2, B3, B4, B5, C, E, and beta carotene); (2) vitamin premixes (a blend of several vitamins and other products in either dry or spray-on applications); and (3) products containing vitamins and vitamin premixes (vitamin supplements, milk, bread, cereal, juice, beverage powders, eggs, meat, fish, poultry, pork products, pasta, flour, rice, baby food, baby formula, pet food, and cosmetics).

[5]This case is one small part of nationwide litigation against the defendants for price-fixing and other anticompetitive conduct. A class action lawsuit was filed on September 30, 1998, in the Superior Court of the District of Columbia and then in twenty-two other jurisdictions (not including Massachusetts), asserting claims on behalf of businesses and consumers who had indirectly purchased vitamin products manufactured by one or more of the defendants. Several of the defendants pleaded guilty to Federal antitrust charges, and they entered into a master settlement agreement to resolve all class and parens patriae litigation.

[6]Several defendants sought to dismiss the plaintiff's complaint for lack of adequate notice pursuant to Mass. R. Civ. P. 8 (a) (1), 365 Mass. 749 (1974), and for failure to allege fraudulent concealment with sufficient particularity pursuant to Mass. R. Civ. P. 9 (b), 365 Mass. 751 (1974). The judge denied those motions, and the defendants have taken no further action on those claims. Several defendants also sought to dismiss the plaintiff's complaint for lack of personal jurisdiction pursuant to Mass. R. Civ. P. 12 (b) (2), 365 Mass.

*Rehnquist*, & *Jaren D. Wilcoxson*

England Legal Foundation.
y General, & *Judith Whiting*, As-
the Commonwealth.
ional Consumer Law Center.

n indirect purchaser[3] of vitamin
l distributed by the defendants,[4]
nctive relief and damages arising
acy among the defendants.[5] Her
ivil conspiracy (count I) and unfair
in violation of G. L. c. 93A (count
motion to dismiss the plaintiff's
. R. Civ. P. 12 (b) (6), 365 Mass.
: judge granted the defendants' mo-
he complaint but denied their mo-
f the complaint.[6] The judge then
her order denying the defendants'
of the plaintiff's complaint to the

who buy products not directly from their
es further down the distribution chain. See
.S. 720, 726 (1977).

(1) specific vitamins (vitamins A, B, B2,
:); (2) vitamin premixes (a blend of several
ner dry or spray-on applications); and (3)
vitamin premixes (vitamin supplements,
e powders, eggs, meat, fish, poultry, pork
od, baby formula, pet food, and cosmetics).

ationwide litigation against the defendants
etitive conduct. A class action lawsuit was
Superior Court of the District of Columbia
lictions (not including Massachusetts), as-
esses and consumers who had indirectly
actured by one or more of the defendants.
uilty to Federal antitrust charges, and they
greement to resolve all class and parens

smiss the plaintiff's complaint for lack of
R. Civ. P. 8 (a) (1), 365 Mass. 749 (1974),
t concealment with sufficient particularity
365 Mass. 751 (1974). The judge denied
s have taken no further action on those
ght to dismiss the plaintiff's complaint for
nt to Mass. R. Civ. P. 12 (b) (2), 365 Mass.

Appeals Court pursuant to Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1403 (1996), and stayed all proceedings below. We granted the parties' applications for direct appellate review. The only issue before us is whether indirect purchasers can assert claims for price-fixing or other anticompetitive conduct under G. L. c. 93A, § 9, where they have no standing to bring such claims under the Massachusetts Antitrust Act (Antitrust Act), G. L. c. 93, §§ 1-14A. Because we conclude that indirect purchasers can assert such claims, we affirm the order of the Superior Court judge.[7]

The sufficiency of the claims raised in the plaintiff's complaint is examined by accepting the allegations, and such reasonable inferences as may be drawn therefrom, as true. See *Eyal* v. *Helen Broadcasting Corp.*, 411 Mass. 426, 429 (1991). A complaint is sufficient "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Nader* v. *Citron*, 372 Mass. 96, 98 (1977), quoting *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957).

The defendants, who dominate international markets for vitamin products,[8] are foreign corporations doing business in the Commonwealth of Massachusetts. The plaintiff alleges that, beginning in January, 1990, the defendants conspired among themselves to restrain free trade of vitamin products by suppressing and eliminating competition. The conspiracy consisted of formal and informal collusion by the defendants to (1) fix, increase, and maintain prices for vitamin products; (2) coordinate price increases among themselves for the sale of vitamin products; (3) allocate among themselves the volume of sales and market shares of vitamin products; (4) allocate among

754 (1974). These motions were not addressed by the judge pursuant to agreement by the parties.

[7]We acknowledge the amicus briefs filed by Microsoft Corporation; the National Consumer Law Center; the New England Legal Foundation; and the Attorney General on behalf of the Commonwealth.

[8]The defendants F. Hoffmann-La Roche, Ltd.; Hoffmann-La Roche, Inc.; and Roche Vitamins Inc., control approximately 40% of the relevant world vitamin market. The defendants BASF A.G. and BASF Corporation control approximately 20% of that market. The defendants Rhone-Poulenc, S.A.; Rhone-Poulenc Animal Nutrition, Inc.; and Rhone-Poulenc, Inc., control approximately 15% of the market.

themselves all or part of certain contracts to supply vitamin products to various customers; and (5) refrain from submitting bids, or submit collusive, noncompetitive, and rigged bids. The effect of the defendants' alleged conduct was to restrict competition in the sale of vitamin products in Massachusetts and to force consumers to pay prices for such products that were artificially inflated.

In considering the claims set forth in the plaintiff's complaint, alleging violations of G. L. c. 93A, the judge examined the relationship between that statutory scheme and the Antitrust Act. She concluded that, based on their respective language and history, G. L. c. 93A should not be interpreted to bar the plaintiff, as an indirect purchaser, from bringing an action for price-fixing or other forms of unfair competition against the defendants. Because the plaintiff had stated a claim on which relief could be granted, the defendants' motions to dismiss count II of her complaint were denied.

The defendants contend that the plaintiff's allegations of price-fixing fall within the limits of the Antitrust Act and that, in light of the precedent established in *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720 (1977), the plaintiff is precluded from bringing a claim under that Act because she is an *indirect* purchaser of vitamin products. The defendants argue that principles of statutory construction, as well as public policy concerns, mandate that G. L. c. 93A be construed harmoniously with related statutes, including the Antitrust Act. As such, indirect purchasers should be barred from bringing price-fixing claims under G. L. c. 93A. To conclude otherwise would be to allow indirect purchasers to circumvent the limitations on plaintiffs' remedies in the Antitrust Act by bringing their causes of action under G. L. c. 93A.

The purpose of the Antitrust Act, enacted in 1978, is "to encourage free and open competition in the interests of the general welfare and economy by prohibiting unreasonable restraints of trade and monopolistic practices in the commonwealth." G. L. c. 93, § 1. To that end, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the commonwealth shall be unlawful." G. L. c. 93, § 4. "Any person

n contracts to supply vitamin
nd (5) refrain from submitting
npetitive, and rigged bids. The
conduct was to restrict competi-
ducts in Massachusetts and to
for such products that were

rth in the plaintiff's complaint,
93A, the judge examined the
ory scheme and the Antitrust
n their respective language and
ot be interpreted to bar the
r, from bringing an action for
nfair competition against the
f had stated a claim on which
fendants' motions to dismiss
enied.

the plaintiff's allegations of
of the Antitrust Act and that,
ished in *Illinois Brick Co.* v.
he plaintiff is precluded from
ct because she is an *indirect*
. The defendants argue that
tion, as well as public policy
3A be construed harmoniously
; the Antitrust Act. As such,
rred from bringing price-fixing
nclude otherwise would be to
ircumvent the limitations on
st Act by bringing their causes

Act, enacted in 1978, is "to
etition in the interests of the
by prohibiting unreasonable
opolistic practices in the
§ 1. To that end, "[e]very
rm of trust or otherwise, or
e or commerce in the com-
G. L. c. 93, § 4. "Any person

who shall be injured in his business or property by reason of a violation of the provisions of [G. L. c. 93] may sue therefor and recover the actual damages sustained, together with the costs of suit, including reasonable attorney fees." G. L. c. 93, § 12. The Antitrust Act is to be "construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable."[9] G. L. c. 93, § 1.

"Federal courts consistently have held that an agreement among competitors to raise, depress, stabilize, or fix the price of goods in commerce is illegal per se." *Commonwealth* v. *Mass. CRINC*, 392 Mass. 79, 92 (1984). See *Catalano, Inc.* v. *Target Sales, Inc.*, 446 U.S. 643, 647 (1980); *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940). In analyzing § 4 of the Clayton Act, 15 U.S.C. § 15 (2000), the Supreme Court concluded that only the overcharged direct purchaser, and not others in the chain of manufacture or distribution (such as an indirect purchaser), was "injured in his business or property" for purposes of recovering damages for the violation of federal antitrust laws.[10] See *Illinois Brick Co.* v. *Illinois*, *supra* at 729-736. See also *Kansas* v. *Utilicorp United Inc.*, 497 U.S. 199, 206-208 (1990). Because the Antitrust Act is to be construed in

[9]Federal antitrust law includes (1) the Sherman Act, 15 U.S.C. § 1 (2000) (making illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations"); and (2) the Clayton Act, 15 U.S.C. § 15 (2000) (authorizing civil actions by any person "injured in his business or property by reason of anything forbidden in the antitrust laws").

[10]In reaching this conclusion, the Supreme Court specifically declined to modify its prior decision in *Hanover Shoe, Inc.* v. *United Shoe Mach. Corp.*, 392 U.S. 481 (1968). See *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720, 736-747 (1977). In that case, the Supreme Court held that the victim of an overcharge was damaged within the meaning of § 4 of the Clayton Act, 15 U.S.C. § 15, and that the defendant could not introduce evidence that the purchaser had "passed on" the overcharge to its own customers, thereby sustaining no injury. *Hanover Shoe, Inc.* v. *United Shoe Mach. Corp.*, *supra* at 488-494. In considering whether to allow the indirect purchasers to maintain a cause of action against the anticompetitive actors, the Supreme Court would have had to modify its holding in *Hanover Shoe* because to do otherwise would have permitted multiple recoveries of the same damages, once by the direct purchasers and again by the indirect purchasers. *Illinois Brick Co.* v. *Illinois*, *supra* at 728-735. The Supreme Court rejected a proposed modification of *Hanover Shoe* based on considerations of stare decisis and for reasons of public policy. *Id.* at 736-746.

harmony with judicial interpretations of comparable Federal antitrust statutes, the rule of law established in *Illinois Brick Co.* v. *Illinois*, *supra*, would apply with equal force to preclude claims brought under G. L. c. 93 by indirect purchasers in Massachusetts. See *Boos* v. *Abbott Labs.*, 925 F. Supp. 49, 51 (D. Mass. 1996). See also *Commonwealth* v. *Mass. CRINC*, *supra* at 89 n.9, 95 n.14 (recognizing economic harm suffered by indirect purchasers as result of defendants' price-fixing would not be capable of remediation in light of Supreme Court's *Illinois Brick* decision, but declining to consider whether defendants' activities would constitute a violation of G. L. c. 93A).

The plaintiff does not dispute that she is an indirect purchaser of the defendants' vitamin products within the meaning of *Illinois Brick Co.* v. *Illinois*, *supra*, and that she is therefore foreclosed from pursuing her cause of action under the Antitrust Act. Undoubtedly for that reason, the plaintiff has asserted her claim for relief under G. L. c. 93A. Federal antitrust laws do not expressly preempt States from enacting statutes allowing indirect purchasers to recover damages for their injuries. See *California* v. *ARC Am. Corp.*, 490 U.S. 93, 101-102, 105 (1989) (rejecting claim that California's antitrust law, which specifically allowed indirect purchaser actions, was inconsistent with, and thus preempted by, Federal law). That is exactly what happened in Massachusetts with the enactment of G. L. c. 93A, "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." *Linthicum* v. *Archambault*, 379 Mass. 381, 383 (1979), quoting *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975).

General Laws c. 93A regulates trade and commerce "directly or *indirectly* affecting the people of this commonwealth" (emphasis added).[11] G. L. c. 93A, § 1. The broad language of G. L. c. 93A, § 9 (1), provides that a cause of action may be brought by "[*a*]*ny* person, [other than a businessperson entitled to bring an action under § 11], who has been injured by another

[11]In contrast, the Antitrust Act only regulates trade or commerce that "*directly* and substantially affects the people of the commonwealth" (emphasis added). See G. L. c. 93, §§ 2, 4.

erpretations of comparable Federal of law established in *Illinois Brick* d apply with equal force to preclude L. c. 93 by indirect purchasers in '. *Abbott Labs.*, 925 F. Supp. 49, 51 *Commonwealth* v. *Mass. CRINC, su-* ognizing economic harm suffered by ılt of defendants' price-fixing would iation in light of Supreme Court's ɔut declining to consider whether uld constitute a violation of G. L.

spute that she is an indirect purchaser in products within the meaning of *ois, supra*, and that she is therefore ıer cause of action under the Antitrust reason, the plaintiff has asserted her . c. 93A. Federal antitrust laws do not s from enacting statutes allowing over damages for their injuries. See *rp.*, 490 U.S. 93, 101-102, 105 (1989) fornia's antitrust law, which specifi- chaser actions, was inconsistent with, ederal law). That is exactly what hap- 'ith the enactment of G. L. c. 93A, "a which creates new substantive rights lural devices for the enforcement of v. *Archambault*, 379 Mass. 381, 383 *Westwood Auto, Inc.*, 366 Mass. 688,

egulates trade and commerce "directly he people of this commonwealth" . c. 93A, § 1. The broad language of ovides that a cause of action may be ı, [other than a businessperson entitled ; 11], who has been injured by another

Act only regulates trade or commerce that cts the people of the commonwealth" (emphasis 4.

person's use or employment of any method, act or practice declared to be unlawful by section two" (emphasis added). General Laws c. 93A, § 2, states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

In analyzing what constitutes unfair methods of competition and unfair or deceptive acts or practices, which are not defined in G. L. c. 93A, this court looks to interpretations by the Federal Trade Commission and Federal courts of § 5(a)(1) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a)(1) (2000).[12] See G. L. c. 93A, § 2 (*b*). See also *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 595-596 (1975). The Federal Trade Commission may, under § 5(a)(1) of the FTC Act, enforce the antitrust laws, including the Sherman Act and the Clayton Act, but it is not confined to their specific prohibitions. See *Federal Trade Comm'n* v. *Motion Picture Advertising Serv. Co.*, 344 U.S. 392, 394-395 (1953); *Federal Trade Comm'n* v. *Cement Inst.*, 333 U.S. 683, 692-695 (1948). It may bar incipient violations of those statutes, see *Federal Trade Comm'n* v. *Brown Shoe Co.*, 384 U.S. 316, 321-322 (1966), and conduct that, although not a violation of the letter or spirit of the antitrust laws, is nevertheless either an unfair method of competition, or an unfair or deceptive act or practice, see *Federal Trade Comm'n* v. *Sperry & Hutchinson Co.*, 405 U.S. 233, 239-244 (1972). See also *E.I. Du Pont De Nemours & Co.* v. *Federal Trade Comm'n*, 729 F.2d 128, 136-137 (2d Cir. 1984). To the extent that the same conduct may violate both the antitrust laws and the FTC Act, such conduct may be the subject of simultaneous parallel enforcement actions. See *Federal Trade Comm'n* v. *Cement Inst.*, *supra* at 694-695.

Price-fixing constitutes an unfair method of competition in violation of the FTC Act. See *Federal Trade Comm'n* v. *National Lead Co.*, 352 U.S. 419, 428-430 (1957). See also *Sun Oil Co.* v. *Federal Trade Comm'n*, 350 F.2d 624, 631, 636 (7th Cir.

[12] Section 5(a)(1) of the Federal Trade Commission Act states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a)(1) (2000).

1965), cert. denied, 382 U.S. 982 (1966); *Keasbey & Mattison Co.* v. *Federal Trade Comm'n*, 159 F.2d 940, 946 (6th Cir. 1947); *Boos* v. *Abbott Labs.*, *supra* at 54.[13] Therefore, the allegations in the plaintiff's complaint, which in essence state that the defendants engaged in price-fixing of vitamin products at artificially inflated levels to her detriment would, if proven, clearly state a violation of G. L. c. 93A.

The plain and unambiguous language of G. L. c. 93A reveals no legislative intent to limit lawsuits for price-fixing to direct purchasers. To the contrary, because the language of G. L. c. 93A, §§ 1, 9 (1), allows *any* person who has been injured by trade or commerce *indirectly* affecting the people of this Commonwealth to bring a cause of action, the plaintiff is the type of consumer the Legislature intended to protect.[14] Significantly, there is no requirement of contractual privity between the plaintiff and the defendants under G. L. c. 93A, § 9. See *Kattar* v. *Demoulas*, 433 Mass. 1, 14-15 (2000) ("Parties need not be in privity for their actions to come within the reach of c. 93A"); *Maillet* v. *ATF-Davidson Co.*, 407 Mass. 185, 191-192 (1990) (injured printing press operator could maintain suit against manufacturer); *Burnham* v. *Mark IV Homes, Inc.*, 387 Mass. 575, 581 (1982) (buyer of modular home could sue manufacturer).

It is a canon of statutory construction that "the primary source of insight into the intent of the Legislature is the language of the statute." *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 853 (1983). Where, as here, the language of a statute is clear and unambiguous, it is conclusive as to the intent of the

[13]Several of these cases also include language stating that price-fixing constitutes an unfair practice in violation of the FTC Act. This is a distinction without a difference in the present case because G. L. c. 93A, § 2, prohibits *both* "[u]nfair methods of competition" and "unfair or deceptive acts or practices."

[14]The broad scope of G. L. c. 93A is evidenced by the fact that it encompasses claims where a plaintiff's damages are de minimis. See *Leardi* v. *Brown*, 394 Mass. 151, 157-163 (1985) (tenants could bring action under G. L. c. 93A for inclusion of illegal term in lease, even where tenants suffered no actual harm, because mere invasion of legal right to habitable premises constituted injury). See also *Clegg* v. *Butler*, 424 Mass. 413, 418 (1997) (third-party claimants could bring actions against liability insurers who violated G. L. c. 93A by invading their legally protected interests).

82 (1966); *Keasbey & Mattison* ı, 159 F.2d 940, 946 (6th Cir. *upra* at 54.[13] Therefore, the al- laint, which in essence state that e-fixing of vitamin products at er detriment would, if proven, c. 93A.

anguage of G. L. c. 93A reveals wsuits for price-fixing to direct because the language of G. L. person who has been injured by fecting the people of this Com- ıction, the plaintiff is the type of ıded to protect.[14] Significantly, ontractual privity between the er G. L. c. 93A, § 9. See *Kattar* 15 (2000) ("Parties need not be ne within the reach of c. 93A"); 407 Mass. 185, 191-192 (1990) or could maintain suit against *ırk IV Homes, Inc.*, 387 Mass. modular home could sue

ruction that "the primary source Legislature is the language of *Ins. Co.* v. *Wilson*, 387 Mass. re, the language of a statute is nclusive as to the intent of the

de language stating that price-fixing on of the FTC Act. This is a distinction e because G. L. c. 93A, § 2, prohibits on" and "unfair or deceptive acts or

A is evidenced by the fact that it damages are de minimis. See *Leardi* v. 35) (tenants could bring action under n in lease, even where tenants suffered n of legal right to habitable premises . *Butler*, 424 Mass. 413, 418 (1997) ctions against liability insurers who legally protected interests).

Legislature. See *Pyle* v. *School Comm. of S. Hadley*, 423 Mass. 283, 285 (1996). "Where the ordinary meaning of the statutory terms yields a workable result, we need not resort to extrinsic aids of interpretation such as legislative history."[15] *Id.* at 286.

The defendants assert that the Antitrust Act specifically governs contracts, combinations, or conspiracies in restraint of trade or commerce, see G. L. c. 93, § 4, which is the type of conduct that the plaintiff has alleged.[16] They further assert that, in contrast, G. L. c. 93A, § 9, is a general remedy for consumers injured by any unfair method of competition and unfair or deceptive act or practice in the conduct of any trade or commerce. The defendants argue that, because the provisions of

[15]Following the Supreme Court's decision in *Illinois Brick Co.* v. *Illinois*, *supra*, some States enacted so-called *Illinois Brick* repealer statutes to permit damages actions by or on behalf of indirect purchasers. See, e.g., Cal. Bus. & Prof. Code § 16750(a) (Deering 1992); Me. Rev. Stat. Ann. tit. 10, § 1104 (West 1997); N.Y. Gen. Bus. Law § 340(6) (McKinney Supp. 2002); R.I. Gen. Laws § 6-36-12(g) (2001); Vt. Stat. Ann. tit. 9, § 2465(b) (Supp. 2001). For a discussion on State responses to *Illinois Brick Co.* v. *Illinois*, *supra*, see K. O'Connor, Is the *Illinois Brick* Wall Crumbling?, 15 Antitrust 34, 35 (Summer 2001) (noting that thirty-six States and District of Columbia, representing over seventy per cent of the nation's population, now provide for some sort of right of action on behalf of some or all indirect purchasers). The defendants contend that the fact that the Legislature declined to enact such legislation in Massachusetts, as proposed on several occasions by the Attorney General, suggests an intent not to recognize causes of action by indirect purchasers. See 1985 Senate Doc. No. 1071; 1986 Senate Doc. No. 1033; 1987 House Doc. No. 4104; 1990 Senate Doc. No. 101; 1991 Senate Doc. No. 1579; 1992 Senate Doc. No. 1563; 1993 Senate Doc. No. 120; 1994 Senate Doc. No. 82. However, no inference is possible from this negative history. "The fallacy in th[e] argument is that no one knows why the legislature did not pass the proposed measure[]. . . . The practicalities of the legislative process furnish many reasons for the lack of success of a measure other than legislative dislike for the principle involved in the legislation." *Franklin* v. *Albert*, 381 Mass. 611, 615-616 (1980), quoting *Berry* v. *Branner*, 245 Or. 307, 311 (1966). One such reason is the "[b]elief that the matter should be left to be handled by the normal processes of judicial development of decisional law, including the overruling of outstanding decisions to the extent that the sound growth of the law requires." *Franklin* v. *Albert*, *supra* at 616, quoting H. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 1395-1396 (tent. ed. 1958). Moreover, the proposed bills, if enacted, would have modified the Antitrust Act, not G. L. c. 93A.

[16]While the plaintiff has alleged in her complaint that the defendants entered into a conspiracy in illegal restraint or monopoly of trade, she also alleged that the defendants' price-fixing conspiracy constituted "unfair and/or deceptive acts or practices within the meaning of G. L. c. 93A, § 2."

the specific statute must control, G. L. c. 93A must be construed consistently with the Antitrust Act to bar claims by indirect purchasers.

Federal antitrust statutes (such as the Clayton Act) and Federal consumer statutes (such as the FTC Act) were enacted to deal with closely related aspects of the same problem, namely the protection of free and fair competition. See *United States* v. *American Bldg. Maintenance Indus.*, 422 U.S. 271, 277 (1975). Because the Antitrust Act and G. L. c. 93A are patterned after their Federal counterparts, we believe that they, too, in part, are related to the same purpose — the protection of free and fair competition.

Statutes addressing the same subject matter clearly are to be construed harmoniously so as to give full effect to all of their provisions and give rise to a consistent body of law. See *Green* v. *Wyman-Gordon Co.*, 422 Mass. 551, 554 (1996); *Marco* v. *Green*, 415 Mass. 732, 736 (1993). However, the language of the Antitrust Act unambiguously states that it "shall have no effect upon the provisions of [c. 93A], except as *explicitly provided* in said [c. 93A]" (emphasis added).[17] G. L. c. 93, § 14A. General Laws c. 93A, § 11, includes a specific provision that in

[17]The premise of the dissent is that the court's interpretation of G. L. c. 93A, § 9, in relation to G. L. c. 93, results in contradictions and unreasonable consequences. There are no such contradictions or unreasonable consequences. The absence of any legislative enactment limiting the application of G. L. c. 93A, § 9, in claims involving antitrust allegations clearly signifies, under the mandate of G. L. c. 93, § 14A, that G. L. c. 93 has no effect on G. L. c. 93A, § 9. The dissent states that, "[w]hile inserting the word 'method' in § 9 (1), the Legislature conspicuously failed to add it to the class action provisions of § 9 (2). . . . If the Legislature intended to allow indirect purchaser consumers to bring claims for antitrust violations, it is anomalous in the extreme that the Legislature would exclude such claims from the class action mechanism of § 9 (2)." *Post* at 73. There are two responses. First, antitrust violations are actionable under G. L. c. 93A, § 9 (1), not only because they are unfair methods of competition, but also because they constitute unfair acts or practices, *supra* at note 13, and because the Legislature did not explicitly preclude antitrust activity as a violation of § 9 (1). Second, assuming that the omission of the word "method" from G. L. c. 93A, § 9 (2), precludes a class action thereunder, as the dissent suggests (the question is not before us: no class has yet been certified), it does not follow that an inability to bring a class action under § 9 (2) precludes an individual claim under § 9 (1). Nevertheless, a class action may be brought under G. L. c. 93A, § 9 (2), for unfair acts or practices, including antitrust violations. Additionally, § 9 (2), enacted in 1969, before the adoption of the Massachusetts Rules of Civil Procedure, does not preclude a class action for

any action brought un
in its interpretation o
provisions of the An
contains no such ex
intended actions broug
in this respect, it wo
*Galvin*, 388 Mass. 32
employed specific lang
the language should r
Therefore, we canno
c. 93A, § 9, is to be
Act, and by associatio
as to preclude indirect
ing a cause of action

The defendants' reli
*Motors Corp.*, 378 M
*dour*, 394 Mass. 720 (
In *Reiter Oldsmobile,*
court held that only t
detailed statute enacte
the unfairness in the
applicable to the plai
tive motor vehicle fr
prior approval constit
unfair or deceptive ac
c. 93A, § 2. We point
on the private remedi
excluded injunctive
c. 93A, § 9. See *id.*
G. L. c. 93B might o
conflict, such as the
language of the spec
govern. See *id.* Simil
this court held that C
comprehensive regul

unfair methods of competit
Mass. R. Civ. P. 23. See *Fl*
*Baldassari* v. *Public Fin. T*

G. L. c. 93A must be construed Act to bar claims by indirect

as the Clayton Act) and Federal ·TC Act) were enacted to deal the same problem, namely the ıpetition. See *United States* v. *dus.*, 422 U.S. 271, 277 (1975). J. L. c. 93A are patterned after ·lieve that they, too, in part, are the protection of free and fair

subject matter clearly are to be › give full effect to all of their ısistent body of law. See *Green* ss. 551, 554 (1996); *Marco* v. 93). However, the language of states that it "shall have no ef- A], except as *explicitly provided* ıdded).[17] G. L. c. 93, § 14A. udes a specific provision that in

e court's interpretation of G. L. c. 93A, s in contradictions and unreasonable dictions or unreasonable consequences. ıent limiting the application of G. L. t allegations clearly signifies, under the L. c. 93 has no effect on G. L. c. 93A, erting the word 'method' in § 9 (1), the d it to the class action provisions of : to allow indirect purchaser consumers it is anomalous in the extreme that the ; from the class action mechanism of ·sponses. First, antitrust violations are ot only because they are unfair methods ıstitute unfair acts or practices, *supra* at not explicitly preclude antitrust activity uming that the omission of the word ecludes a class action thereunder, as the ·re us: no class has yet been certified), it ; a class action under § 9 (2) precludes rtheless, a class action may be brought r acts or practices, including antitrust :d in 1969, before the adoption of the ɜ, does not preclude a class action for

any action brought under that section, the court shall be guided in its interpretation of unfair methods of competition by the provisions of the Antitrust Act. General Laws c. 93A, § 9, contains no such explicit provision. If the Legislature had intended actions brought under G. L. c. 93A, § 9, to be limited in this respect, it would have said so. See *Commonwealth* v. *Galvin*, 388 Mass. 326, 330 (1983) ("where the Legislature has employed specific language in one paragraph, but not in another, the language should not be implied where it is not present"). Therefore, we cannot conclude that the application of G. L. c. 93A, § 9, is to be guided by the provisions of the Antitrust Act, and by association, *Illinois Brick Co.* v. *Illinois*, *supra*, so as to preclude indirect purchasers, like the plaintiff, from bringing a cause of action under G. L. c. 93A, § 9.

The defendants' reliance on *Reiter Oldsmobile, Inc.* v. *General Motors Corp.*, 378 Mass. 707 (1979), and *Cabot Corp.* v. *Baddour*, 394 Mass. 720 (1985), does not support a different result. In *Reiter Oldsmobile, Inc.* v. *General Motors Corp.*, *supra*, this court held that only the remedies afforded by G. L. c. 93B, a detailed statute enacted after G. L. c. 93A specifically to govern the unfairness in the Massachusetts automotive industry, were applicable to the plaintiff's claims that the grant of a competitive motor vehicle franchise without the current franchisee's prior approval constituted an unfair method of competition and unfair or deceptive act or practice within the meaning of G. L. c. 93A, § 2. We pointed out that there was a careful limitation on the private remedies set forth in G. L. c. 93B, § 12, which excluded injunctive relief, a remedy available under G. L. c. 93A, § 9. See *id.* at 711. As such, while G. L. c. 93A and G. L. c. 93B might overlap in their coverage, in the case of a conflict, such as the remedies available to a plaintiff, the language of the specific statute, namely G. L. c. 93B, must govern. See *id.* Similarly, in *Cabot Corp.* v. *Baddour*, *supra*, this court held that G. L. c. 110A (Uniform Securities Act), a comprehensive regulatory scheme governing the registration

unfair methods of competition pursuant to the more burdensome provisions of Mass. R. Civ. P. 23. See *Fletcher* v. *Cape Cod Gas Co.*, 394 Mass. 595 (1985); *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33, 40-41 (1975).

and sale of securities in Massachusetts in coordination with Federal securities laws, was applicable to the plaintiff's claims of fraudulent securities transactions, rather than G. L. c. 93A. We pointed out that G. L. c. 110A differed from G. L. c. 93A in several critical respects, including its limitation on private rights of action and the nature and scope of available relief; more expansive rights of action and remedies were available under G. L. c. 93A. See *id.* at 725.

Unlike the particular statutes in *Reiter Oldsmobile, Inc.* v. *General Motors Corp., supra*, and *Cabot Corp.* v. *Baddour, supra*, neither the Antitrust Act nor G. L. c. 93A is a comprehensive statutory scheme enacted to govern all antitrust claims to the exclusion of the other. To the contrary, the Legislature intended that the Antitrust Act would not infringe on the scope of G. L. c. 93A, *except* as G. L. c. 93A might itself explicitly provide, see G. L. c. 93, § 14A, which negates the possibility for conflict among their provisions and in their application. Cf. *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 773-774 n.15 (1980) (noting Antitrust Act operates independently of G. L. c. 93A except to extent G. L. c. 93A, § 11, directs courts to consider decisions under Antitrust Act when interpreting "unfair methods of competition" in actions brought pursuant to G. L. c. 93A, § 11); *Dodd* v. *Commercial Union Ins. Co.*, 373 Mass. 72, 76-78 (1977) ("Chapter 176D on its face does not exclude application of c. 93A to unfair and deceptive insurance practices . . . [t]he mere existence of one regulatory statute does not affect the applicability of a broader, nonconflicting statute, particularly when both statutes provide for concurrent coverage of their common subject matter"). Moreover, G. L. c. 93A and the Antitrust Act are not in conflict or inconsistent with each other merely because the former would allow indirect purchasers to sue for damages while the latter would not.[18]

The defendants assert that, notwithstanding the Antitrust Act,

[18]In light of our conclusion that G. L. c. 93A allows indirect purchasers to bring a cause of action for anticompetitive conduct that would be precluded under the Antitrust Act, the defendants' argument that the plaintiff could not be "injured" within the meaning of G. L. c. 93A, § 9, because she is not "injured" under the Antitrust Act is without merit. The court in *Illinois Brick Co.* v. *Illinois, supra* at 746-747, did not conclude that indirect purchasers were not injured by illegal overcharges passed on by direct purchasers. Rather,

the plaintiff has fa
between herself and
c. 93A. The defend
removed in the ch
consumer of a wide
vitamin products as
contend that the plai
portion of an overc
distribution chain an

The defendants' c
plaintiff can prove l
she is entitled, as ar
In her complaint, tl
vitamin products m
by the defendants
conspiracy among tl
competitive prices'
relatively light burd
doubt as to whethe
proper basis for dis
See *Gibbs Ford, Inc*
8, 13 (1987); *Wrigh*
(1985). In light of
bring a cause of act
the allegations in th
a claim on which
can prove her clai
contrary to the defe
connection between
one, as parties to
*Co.* v. *Boston Gas*
(plaintiffs failed to
§ 11, where there
*Cash Energy, Inc.*

it concluded that indire
ages claims for such in
place on the judicial sy
was a more efficient m
acts given the small sta
747.

:husetts in coordination with
icable to the plaintiff's claims
ons, rather than G. L. c. 93A.
differed from G. L. c. 93A in
its limitation on private rights
ope of available relief; more
emedies were available under

in *Reiter Oldsmobile, Inc.* v.
l *Cabot Corp.* v. *Baddour, su-*
G. L. c. 93A is a comprehen-
govern all antitrust claims to
the contrary, the Legislature
ould not infringe on the scope
c. 93A might itself explicitly
which negates the possibility
ns and in their application. Cf.
*y Gen.*, 380 Mass. 762, 773-
Act operates independently of
L. c. 93A, § 11, directs courts
ntitrust Act when interpreting
in actions brought pursuant to
*mmercial Union Ins. Co.*, 373
ter 176D on its face does not
unfair and deceptive insurance
ence of one regulatory statute
y of a broader, nonconflicting
statutes provide for concurrent
ect matter"). Moreover, G. L.
not in conflict or inconsistent
the former would allow indirect
hile the latter would not.[18]
twithstanding the Antitrust Act,

. c. 93A allows indirect purchasers to
itive conduct that would be precluded
' argument that the plaintiff could not
G. L. c. 93A, § 9, because she is not
thout merit. The court in *Illinois Brick*
not conclude that indirect purchasers
passed on by direct purchasers. Rather,

the plaintiff has failed to allege a sufficiently close nexus between herself and the defendants to state a claim under G. L. c. 93A. The defendants point out that they are many levels removed in the chain of distribution from the plaintiff, a consumer of a wide range of products, many of which contain vitamin products as only a minor component. The defendants contend that the plaintiff would be hard pressed to show how a portion of an overcharge was passed on at *each* stage of the distribution chain and by which defendants.

The defendants' contentions essentially relate to whether the plaintiff can prove her claim under G. L. c. 93A, not whether she is entitled, as an indirect purchaser, to assert such a claim. In her complaint, the plaintiff alleged that she had purchased vitamin products manufactured, produced, distributed, and sold by the defendants and that, as the result of a price-fixing conspiracy among the defendants, she was forced to pay "supra-competitive prices" for those products. The plaintiff has a relatively light burden to carry to maintain her complaint, and doubt as to whether a particular claim can be proved is not a proper basis for dismissing a complaint under rule 12 (b) (6). See *Gibbs Ford, Inc.* v. *United Truck Leasing Corp.*, 399 Mass. 8, 13 (1987); *Wrightson* v. *Spaulding*, 20 Mass. App. Ct. 70, 72 (1985). In light of our conclusion that indirect purchasers can bring a cause of action under G. L. c. 93A, and accepting all of the allegations in the plaintiff's complaint as true, she has stated a claim on which relief can be granted. Whether the plaintiff can prove her claim is another matter entirely. Nonetheless, contrary to the defendants' assertions, the plaintiff has alleged a connection between herself and the defendants, albeit an indirect one, as parties to consumer transactions. Contrast *John Boyd Co.* v. *Boston Gas Co.*, 775 F. Supp. 435, 440 (D. Mass. 1991) (plaintiffs failed to state cause of action under G. L. c. 93A, § 11, where there was no business connection between parties); *Cash Energy, Inc.* v. *Weiner*, 768 F. Supp. 892, 893-894 (D.

it concluded that indirect purchasers should not be permitted to pursue damages claims for such injuries because of the burdens that such lawsuits would place on the judicial system and because limiting recovery to direct purchasers was a more efficient means of making antitrust violators pay for their illegal acts given the small stakes of indirect purchasers in these lawsuits. *Id.* at 736-747.

Mass. 1991) (same). See also *Nei* v. *Boston Survey Consultants, Inc.*, 388 Mass. 320, 324-325 (1983) (recognizing that while there was no requirement of contractual privity under G. L. c. 93A, plaintiffs had failed to state cause of action where they had no business relationship with defendants). The defendants are manufacturing and distributing vitamin products that are intended for use by persons exactly like the plaintiff, the ultimate consumer.

Finally, the defendants assert that strong public policy considerations dictate that indirect purchaser claims be barred under G. L. c. 93A.[19] In precluding indirect purchaser claims under § 4 of the Clayton Act, 15 U.S.C. § 15, the Supreme Court's analysis in *Illinois Brick Co.* v. *Illinois*, *supra*, focused, in part, on the negative impact that such claims would have on Federal antitrust litigation, including the possibility of multiple liability for defendants, the difficulty faced by an indirect purchaser in proving damages, and the potential burden on the judicial system of long and complicated proceedings. However, in *California* v. *ARC Am. Corp.*, 490 U.S. at 103-105, the Supreme Court recognized that it was inappropriate to consider the congressional policies identified in *Illinois Brick Co.* v. *Illinois*, *supra*, as defining what States should allow under their own antitrust laws. "[N]othing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws." *California* v. *ARC Am. Corp.*, *supra* at 103. To that end, it is the province of the Massachusetts Legislature to make its own policy decisions about whether to permit claims by indirect purchasers for antitrust violations under Massachusetts law.[20] We read the language of G. L. c. 93A as a clear statement of

[19]The dissent suggests that it "makes no sense . . . to [permit both direct and indirect purchasers to bring suit] in the same State court system." *Post* at 77. We are not persuaded that permitting only direct purchasers to bring a cause of action and retain as damages the amount that they passed along to indirect purchasers, something that the dissent recognizes as a windfall at the expense of the true victims further down the distribution chain, is the correct result. *Post* at 76-77.

[20]Some of the perceived difficulty in calculating and apportioning damages between direct and indirect purchasers was obviated by the Massachusetts Legislature when it included language in G. L. c. 93A, § 9 (3), allowing consumers who prevailed on claims of unfair methods of competition and

legislative policy to p
the authorization of
disagreement with t
Legislature.

Sosman, J. (dissenti
I agree with the cou
c. 93A, § 9 (1), woul
bring an action premis
laws. Since its amend
c. 93A, § 9 (1), allow
any "method" declar
§ 2 prohibits "unfa
antitrust violations hav
of competition," the
made antitrust violatio
itself precludes an ind
has been "injured" b
purchaser actions a
Antitrust Act, G. L.
express provisions of
principles of *Cabot* (
(1985), and *Reiter C*
378 Mass. 707, 711 (

unfair or deceptive acts o
to recover actual damage
the extent that the plainti
able to prove actual dam
to a specified remedy. Se
1005, 1012 (1st Cir. 198

[21]The Attorney Genera
tory mandate to protect th
*monwealth* v. *Mass. CRI*
§§ 2, 4, 5, 6, 7, 8. Nothi
Attorney General's powe
for indirect purchasers fo
tive acts or practices in t

ɔ *Nei* v. *Boston Survey Consultants,*
25 (1983) (recognizing that while
of contractual privity under G. L.
to state cause of action where they
› with defendants). The defendants
ributing vitamin products that are
:xactly like the plaintiff, the ultimate

assert that strong public policy
ndirect purchaser claims be barred
ecluding indirect purchaser claims
Act, 15 U.S.C. § 15, the Supreme
'rick Co. v. *Illinois*, *supra*, focused,
ıct that such claims would have on
ncluding the possibility of multiple
.e difficulty faced by an indirect
es, and the potential burden on the
complicated proceedings. However,
*Corp.*, 490 U.S. at 103-105, the
ıat it was inappropriate to consider
identified in *Illinois Brick Co.* v.
'hat States should allow under their
ng in *Illinois Brick* suggests that it
ssional purposes for States to allow
er under their own antitrust laws."
, *supra* at 103. To that end, it is the
etts Legislature to make its own
ther to permit claims by indirect
ations under Massachusetts law.[20]
L. c. 93A as a clear statement of

ıakes no sense . . . to [permit both direct
t] in the same State court system." *Post* at
mitting only direct purchasers to bring a
ıges the amount that they passed along to
the dissent recognizes as a windfall at the
down the distribution chain, is the correct

y in calculating and apportioning damages
asers was obviated by the Massachusetts
guage in G. L. c. 93A, § 9 (3), allowing
ns of unfair methods of competition and

legislative policy to protect Massachusetts consumers through the authorization of such indirect purchaser actions.[21] Any disagreement with the statute should be directed to the Legislature.

*Order denying the defendants' motions to dismiss count II of the complaint affirmed.*

SOSMAN, J. (dissenting, with whom Cowin and Cordy, JJ., join). I agree with the court that, read literally and by itself, G. L. c. 93A, § 9 (1), would allow an indirect purchaser consumer to bring an action premised on a defendant's violation of the antitrust laws. Since its amendment in 1979 (St. 1979, c. 406, § 1), G. L. c. 93A, § 9 (1), allows consumers to bring individual claims for any "method" declared unlawful by G. L. c. 93A, § 2. Where § 2 prohibits "unfair methods of competition," and where antitrust violations have long been recognized as "unfair methods of competition," the insertion of the word "method" in § 9 (1) made antitrust violations actionable under § 9 (1). Nothing in § 9 itself precludes an indirect purchaser from showing that he or she has been "injured" by such violations. Although such indirect purchaser actions are not allowed under the Massachusetts Antitrust Act, G. L. c. 93, I also agree with the court that the express provisions of G. L. c. 93, § 14A, preclude resort to the principles of *Cabot Corp.* v. *Baddour*, 394 Mass. 720, 724-726 (1985), and *Reiter Oldsmobile, Inc.* v. *General Motors Corp.*, 378 Mass. 707, 711 (1979), to resolve the apparent contradiction

unfair or deceptive acts or practices in the conduct of any trade or commerce to recover actual damages or twenty-five dollars, whichever was greater. To the extent that the plaintiff is able to prevail on the issue of liability but is unable to prove actual damages, the Legislature has decided that she is entitled to a specified remedy. See *Whyte* v. *Connecticut Mut. Life Ins. Co.*, 818 F.2d 1005, 1012 (1st Cir. 1987); *Leardi* v. *Brown*, 394 Mass. 151, 160 (1985).

[21]The Attorney General has both a common-law duty and a specific statutory mandate to protect the public interest and enforce public rights. See *Commonwealth* v. *Mass. CRINC*, 392 Mass. 79, 88 (1984). See also G. L. c. 93A, §§ 2, 4, 5, 6, 7, 8. Nothing in this opinion should be construed as limiting the Attorney General's powers and remedies under G. L. c. 93A to seek redress for indirect purchasers for unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

between G. L. c. 93 and G. L. c. 93A, § 9 (1), on the issue of indirect purchaser antitrust claims.

However, the precise problem before us today — namely, the applicability of *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720 (1977) (*Illinois Brick*), to claims under § 9 (1) — was neither addressed nor contemplated by the Legislature in the 1979 amendments inserting the word "method" into § 9 (1), an insertion that was plainly motivated by concerns utterly unrelated to *Illinois Brick*. Meanwhile, in both G. L. c. 93A, § 11, and in G. L. c. 93, § 1, the Legislature has made clear that it does intend to adhere to the principles of *Illinois Brick*. Interpreting § 9 (1) as a repudiation of *Illinois Brick* appears contrary to the Legislature's intent, notwithstanding the technical accuracy of the court's literal reading of § 9 (1). There are occasions when a literal construction of a statute yields "absurd or unreasonable" results, such that that literal construction should not be adopted. *Attorney Gen.* v. *School Comm. of Essex*, 387 Mass. 326, 336 (1982). This is one of those rare occasions. Where the Legislature has made express its decision to follow *Illinois Brick* in all other contexts, it is both "absurd" and "unreasonable" to interpret § 9 (1) in a manner that will undermine *Illinois Brick* for one type of claimant. In light of the history of G. L. c. 93A and G. L. c. 93, and in light of the drastic but unintended consequences of departing from *Illinois Brick* for only a single category of claimants, I am convinced that we should interpret G. L. c. 93A, § 9 (1), in a manner that comports with *Illinois Brick*.

From its inception, G. L. c. 93A, § 2 (*a*), has declared unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Those terms are to be interpreted consistently with the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (2000), as interpreted by the Federal Trade Commission. G. L. c. 93A, § 2 (*b*). The term "unfair method of competition" has, from the earliest days of the Federal Trade Commission Act, included all forms of antitrust violations.

When originally enacted in 1914, the Federal Trade Commis-

.. c. 93A, § 9 (1), on the issue of ims.

em before us today — namely, the *Co.* v. *Illinois*, 431 U.S. 720 (1977) nder § 9 (1) — was neither ad- the Legislature in the 1979 amend- ıethod" into § 9 (1), an insertion y concerns utterly unrelated to *Il-* both G. L. c. 93A, § 11, and in ıture has made clear that it does ples of *Illinois Brick*. Interpreting *inois Brick* appears contrary to the tanding the technical accuracy of § 9 (1). There are occasions when ıtute yields "absurd or unreason- literal construction should not be *hool Comm. of Essex*, 387 Mass. of those rare occasions. Where the ss its decision to follow *Illinois* is both "absurd" and "unreason- a manner that will undermine *Il-* laimant. In light of the history of , and in light of the drastic but departing from *Illinois Brick* for ıimants, I am convinced that we § 9 (1), in a manner that comports

93A, § 2 (*a*), has declared unlaw- ıpetition and unfair or deceptive t of any trade or commerce . . . . reted consistently with the Federal U.S.C. § 45(a)(1) (2000), as rade Commission. G. L. c. 93A, ıod of competition" has, from the ade Commission Act, included all

1914, the Federal Trade Commis-

sion Act declared unlawful only "unfair methods of competition in commerce." Federal Trade Commission Act, c. 311, § 5, 38 Stat. 717 (1917). Antitrust violations, including price-fixing, came within that original prohibition. See, e.g., *Federal Trade Comm'n* v. *Beech-Nut Packing Co.*, 257 U.S. 441, 455 (1922) (vertical price-fixing); *Cream of Wheat Co.* v. *Federal Trade Comm'n*, 14 F.2d 40, 48 (8th Cir. 1926) (same). Following the 1938 amendment to the Act (Wheeler-Lea Act, c. 49, § 3, 52 Stat. 111 [1938]), which added the prohibition against "unfair or deceptive acts or practices in commerce," antitrust violations still continued to be labeled as "unfair methods of competition," not as "unfair or deceptive acts or practices." See, e.g., *Federal Trade Comm'n* v. *Ticor Title Ins. Co.*, 504 U.S. 621, 625 (1992) (horizontal price-fixing arrangement charged as "unfair method of competition"); *Federal Trade Comm'n* v. *Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 418-419, 422 (1990) (boycott to force higher fees charged as "[u]nfair method of competition"); *Federal Trade Comm'n* v. *National Lead Co.*, 352 U.S. 419, 428 (1957) (in case challenging uniform pricing system, "[t]he relevant sections [of the FTC Act] empower the Commission to prevent the use of unfair methods of competition"); *Federal Trade Comm'n* v. *Cement Inst.*, 333 U.S. 683, 720 (1948) (point-based price system was "an unfair method of competition prohibited by the Federal Trade Commission Act"); *Lenox, Inc.* v. *Federal Trade Comm'n*, 417 F.2d 126 (2d Cir. 1969) (price maintenance agreement charged as "unfair method of competition"); *Advertising Specialty Nat'l Ass'n* v. *Federal Trade Comm'n*, 238 F.2d 108, 111 (1st Cir. 1956) (illegal use of list price charged as "adoption and use of unfair methods of competition"); *Chain Inst., Inc.* v. *Federal Trade Comm'n*, 246 F.2d 231, 235 (8th Cir.), cert. denied, 355 U.S. 895 (1957) ("conduct which tends to restrain trade by fixing prices is an unfair method of competition"); *Allied Paper Mills* v. *Federal Trade Comm'n*, 168 F.2d 600, 605 (7th Cir. 1948), cert. denied, 336 U.S. 918 (1949) ("price fixing combination or agreement is clearly an unfair method of competition within the [FTC] Act"); *Keasbey & Mattison Co.* v. *Federal Trade Comm'n*, 159 F.2d 940, 942, 946 (6th Cir. 1947) (price-fixing arrangements, "if proven, constitute

an 'unfair method of competition' " within meaning of FTC Act); *Fort Howard Paper Co.* v. *Federal Trade Comm'n*, 156 F.2d 899, 900, 906 (7th Cir.), cert. denied, 329 U.S. 795 (1946) (uniform pricing system led to FTC complaint that companies "engaged in unfair methods of competition"); *Eugene Dietzgen Co.* v. *Federal Trade Comm'n*, 142 F.2d 321, 326 (7th Cir.), cert. denied, 323 U.S. 730 (1944) ("price fixing agreement is an 'unfair method of competition' "); *Phelps Dodge Ref. Corp.* v. *Federal Trade Comm'n*, 139 F.2d 393, 395-396 (2d Cir. 1943) (exchange of price information resulted in FTC complaint charging "unfair methods of competition"); *California Lumbermen's Council* v. *Federal Trade Comm'n*, 115 F.2d 178, 180, 184 n.2 (9th Cir. 1940), cert. denied, 312 U.S. 709 (1941) (horizontal price-fixing and boycotting charged by FTC as "violation of fair methods of competition").

In its evolution, G. L. c. 93A has used similar terminology — i.e., "[u]nfair methods of competition" or a "method" declared unlawful by § 2 — to refer to antitrust violations. As originally enacted (St. 1967, c. 813, § 1), the statute allowed the Attorney General to bring an enforcement action against any person who "is using or about to use any method, act or practice" declared unlawful by § 2. G. L. c. 93A, § 4.[1] In light of the long-standing precedent that made antitrust violations an "unfair method of competition," the Attorney General's power to remedy any "method" declared unlawful by § 2 clearly included the power to remedy antitrust violations.

In 1969, the Legislature added a private right of action provision to the statute. St. 1969, c. 690. In that first version of G. L. c. 93A, § 9, the Legislature allowed consumers to bring an action if they had suffered a loss of money or property from a defendant's "unfair or deceptive act or practice." *Id.* Conspicuously absent was any consumer private right of action stemming from the use of an "unfair method of competition." The omission was deliberate. See Rice, New Private Remedies for

[1]In that original version, G. L. c. 93A conferred no private right of action but instead lodged all enforcement and remedial powers exclusively in the Attorney General. This approach was consistent with the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (2000), which still lodges enforcement authority only in the Federal Trade Commission and creates no private right of action. See *Holloway* v. *Bristol-Myers Corp.*, 485 F.2d 986, 988 (D.C. Cir. 1973).

tion' " within meaning of FTC v. *Federal Trade Comm'n*, 156 :ert. denied, 329 U.S. 795 (1946) ı FTC complaint that companies competition"); *Eugene Dietzgen ı*, 142 F.2d 321, 326 (7th Cir.), 4) ("price fixing agreement is an "); *Phelps Dodge Ref. Corp.* v. :2d 393, 395-396 (2d Cir. 1943) resulted in FTC complaint charg- ition"); *California Lumbermen's m'n*, 115 F.2d 178, 180, 184 n.2 ³12 U.S. 709 (1941) (horizontal ıarged by FTC as "violation of

has used similar terminology — etition" or a "method" declared antitrust violations. As originally the statute allowed the Attorney ıt action against any person who nethod, act or practice" declared A, § 4.[1] In light of the long- antitrust violations an "unfair Attorney General's power to ıred unlawful by § 2 clearly ıntitrust violations.

d a private right of action provi- 590. In that first version of G. L. owed consumers to bring an ac- s of money or property from a e act or practice." *Id.* Conspicu- :r private right of action stem- ır method of competition." The :ice, New Private Remedies for

³A conferred no private right of action remedial powers exclusively in the At- sistent with the Federal Trade Commis- which still lodges enforcement author- ission and creates no private right of *; Corp.*, 485 F.2d 986, 988 (D.C. Cir.

Consumers: The Amendment of Chapter 93A, 54 Mass. L.Q. 307, 312 (1969) (amendment's orientation to consumers demonstrated "by the fact that section 9 creates a cause of action for injuries resulting from the use of 'unfair or deceptive acts or practices' and not additionally for injury caused by the use of 'unfair methods of competition' which are also declared to be unlawful by section 2 of the act").[2]

Three years later, the Legislature added a private right of action for plaintiffs who were themselves in trade or commerce. St. 1972, c. 614, § 2. Unlike consumer plaintiffs under § 9, plaintiffs engaged in business were accorded a cause of action for the use of "*an unfair method of competition* or an unfair or deceptive act or practice" (emphasis added). G. L. c. 93A, § 11. And, in express recognition that the term "unfair method of competition" encompassed violations of the antitrust laws, the Legislature provided that "the court shall also be guided in its interpretation of unfair methods of competition by those provisions of [G. L. c. 93] known as the Massachusetts Antitrust Act." G. L. c. 93A, § 11, as amended by St. 1978, c. 459, § 3.

There are two important ramifications of that cross-reference. First, if the Legislature had intended that antitrust violations would also come within the term "unfair or deceptive acts or practices in the conduct of any trade or commerce," the cross-reference to the Massachusetts Antitrust Act would not have been limited to the interpretation of "unfair methods of competition."[3] Second, by means of that cross-reference, G. L. c. 93A claims brought by business plaintiffs predicated on defendants' antitrust violations must be consistent with the principles of G. L. c. 93 (including its adoption of Federal antitrust principles, G. L. c. 93, § 1). Thus, under G. L. c. 93A, § 11, as under G. L. c. 93, the principles of *Illinois Brick* preclude actions by indirect purchasers.

In 1979, the Legislature amended the G. L. c. 93A, § 9,

[2]The author of the article was one of the principal draftsmen of St. 1969, c. 690. Rice, New Private Remedies for Consumers: The Amendment of Chapter 93A, 54 Mass. L.Q. 307, 307 n.* (1969).

[3]By comparison, the consumer private action in G. L. c. 93A, § 9, which did not then include a remedy for "unfair methods of competition," contained no cross-reference to the Massachusetts Antitrust Act.

consumers' cause of action in several respects. See St. 1979, c. 406, § 1. The amendment removed the requirement that the consumer plaintiff have "purchase[d] or lease[d] goods, services or property," St. 1979, c. 72, § 1, as well as the requirement that the consumer plaintiff "thereby [have] suffer[ed] any loss of money or property," *id.*, replacing these requirements with the broader predicate that the plaintiff merely have "been injured" by the defendant's violation. The Legislature also specified that plaintiffs "whose rights are affected" by violations of G. L. c. 176D, § 3 (9), could pursue such a claim under G. L. c. 93A, § 9.

These amendments were prompted by this court's decisions in *Dodd* v. *Commercial Union Ins. Co.*, 373 Mass. 72, 81-83 (1977), and *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33 (1975). In *Dodd* v. *Commercial Union Ins. Co.*, *supra*, we held that, while violations of G. L. c. 176D, § 2, were actionable under G. L. c. 93A, § 9, such actions could only be brought by plaintiffs who had themselves purchased the insurance policy in question. Only the actual purchaser of the policy (not additional named insureds or third parties claiming against the insured) could satisfy the provisions of § 9 requiring that the plaintiff have "purchase[d] or lease[d] goods, services or property," and that the plaintiff "thereby [have] suffer[ed] any loss of money or property." See *id.* In *Baldassari* v. *Public Fin. Trust*, *supra* at 44-45 & n.5, we held that claims by plaintiffs complaining of unfair debt collection practices had been properly dismissed for the plaintiffs' failure to allege that the practices, although extreme and outrageous, had resulted in the "loss of money or property, real or personal." By eliminating those requirements, and by the express reference to persons whose "rights" were "affected" by violations of G. L. c. 176D, § 9 (3), the Legislature overruled the limitations that we had identified in *Dodd* v. *Commercial Union Ins. Co.*, *supra*, and *Baldassari* v. *Public Fin. Trust*, *supra*. See *Leardi* v. *Brown*, 394 Mass. 151, 158 (1985); *Van Dyke* v. *St. Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 674-675 (1983).

As part of those 1979 amendments to § 9, the Legislature for the first time inserted the word "method" in the list of violations that would give rise to an action under § 9 (1). Under the

current version, any pla
defendant's "use or empl
declared to be unlawful"
§ 9. G. L. c. 93A, § 9 (1
of the term "method" i
methods of competition"
antitrust violations actio
"injured" by such violati

Bearing in mind, hov
prompted by a desire to
*Ins. Co.*, *supra*, the insert
have been prompted by
violations of G. L. c. 176
General Laws c. 176D,
determined to be "an unf
or deceptive act or practi
the list of prohibited pra
constitutes the definition
unfair or deceptive ac
insurance." It is not surpr
all violations of G. L. c.
c. 93A, § 9, terminolog
employed.

While inserting the wo
conspicuously failed to a
§ 9 (2). Section 9 (2) all
tion "if the use or emplo
practice has caused simil
Consumer class actions
persons who have been i
or practice" and do not
methods of competition.'
indirect purchaser consu
tions, it is anomalous in
exclude such claims from

[4]By comparison, the class ac
allow such actions "if the use
*tion* or the unfair or deceptiv
numerous other persons simila

l respects. See St. 1979, the requirement that the r lease[d] goods, services well as the requirement ıave] suffer[ed] any loss these requirements with tiff merely have "been n. The Legislature also are affected" by viola- ursue such a claim under

by this court's decisions ., 373 Mass. 72, 81-83 ı. *Trust*, 369 Mass. 33 *Ins. Co.*, *supra*, we held ), § 2, were actionable ould only be brought by d the insurance policy in he policy (not additional ing against the insured) quiring that the plaintiff ervices or property," and r[ed] any loss of money *ıblic Fin. Trust*, *supra* at plaintiffs complaining of n properly dismissed for the practices, although ı the "loss of money or ting those requirements, ıs whose "rights" were c. 176D, § 9 (3), the ıat we had identified in *upra*, and *Baldassari* v. *Brown*, 394 Mass. 151, *& Marine Ins. Co.*, 388

§ 9, the Legislature for od" in the list of viola- ınder § 9 (1). Under the

current version, any plaintiff who has been "injured" by a defendant's "use or employment of any *method*, act or practice declared to be unlawful" under § 2 may bring an action under § 9. G. L. c. 93A, § 9 (1) (emphasis added). It is that insertion of the term "method" in § 9 (1), which refers to "[u]nfair methods of competition" proscribed by § 2, that now makes antitrust violations actionable by a consumer who has been "injured" by such violations.

Bearing in mind, however, that these amendments were prompted by a desire to overrule *Dodd* v. *Commercial Union Ins. Co.*, *supra*, the insertion of the word "method" appears to have been prompted by the Legislature's intent to make all violations of G. L. c. 176D actionable under G. L. c. 93A, § 9. General Laws c. 176D, § 2, proscribes any trade practice determined to be "an unfair method of competition or an unfair or deceptive act or practice in the business of insurance," and the list of prohibited practices set forth in G. L. c. 176D, § 3, constitutes the definition of "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance." It is not surprising that, in an attempt to clarify that all violations of G. L. c. 176D were within the ambit of G. L. c. 93A, § 9, terminology consistent with G. L. c. 176D was employed.

While inserting the word "method" in § 9 (1), the Legislature conspicuously failed to add it to the class action provisions of § 9 (2). Section 9 (2) allows the plaintiff to pursue a class action "if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons." Consumer class actions under § 9 (2) are thus still limited to persons who have been injured by an "unfair or deceptive act or practice" and do not extend to persons injured by "[u]nfair methods of competition."[4] If the Legislature intended to allow indirect purchaser consumers to bring claims for antitrust violations, it is anomalous in the extreme that the Legislature would exclude such claims from the class action mechanism of § 9 (2).

[4]By comparison, the class action provisions of G. L. c. 93A, § 11, expressly allow such actions "if the use or employment of *the unfair method of competition* or the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated" (emphasis added).

By their nature, such claims will be held by vast numbers of consumer victims, with each victim ordinarily suffering only a very small monetary injury. Such claims, if the Legislature actually intended to allow them, would be a paradigm class action. That the Legislature did not include the word "method" in § 9 (2) strongly suggests that the insertion of the word "method" in § 9 (1) had nothing to do with indirect purchaser antitrust claims.

It appears that, in inserting the word "method" in § 9 (1), the Legislature was not even contemplating antitrust actions at all. Nothing in *Dodd* v. *Commercial Union Ins. Co.*, *supra*, had anything to do with antitrust violations, and there is nothing to suggest that concerns about consumer plaintiffs' inability to pursue antitrust violations under G. L. c. 93A prompted the 1979 amendments. In no event should the mere insertion of the word "method" in § 9 (1), an insertion made as part of a legislative overruling of *Dodd* v. *Commercial Union Ins. Co.*, *supra*, be interpreted as a legislative decision to depart from the long-standing principle of both Federal and Massachusetts antitrust law that expressly precluded indirect purchaser claims in accordance with *Illinois Brick*.[5] There is no reason to believe that amendments aimed at overruling *Dodd* v. *Commercial Union Ins. Co.*, *supra*, simultaneously intended a dramatic change in the Legislature's approach to antitrust remedies. Drastic consequences of this magnitude should not flow from ambiguity and oversight in draftsmanship. "It is not to be lightly supposed that radical changes in the law were intended where not plainly expressed." *Commonwealth* v. *Burke*, 390 Mass. 480, 486 (1983), quoting *Ferullo's Case*, 331 Mass. 635, 637 (1954).

Here, under the court's interpretation, we have not only a "radical change" in the law but an irreconcilable conflict with another policy that the Legislature has announced in unambiguous terms. The Massachusetts Antitrust Act was enacted in 1978, one year after the Supreme Court's decision in *Illinois*

[5]Until the Supreme Court's decision ten years later in *California* v. *ARC Am. Corp.*, 490 U.S. 93, 103-105 (1989), it was not even clear that the States would be permitted to deviate from *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720 (1977) (*Illinois Brick*).

ims will be held by vast numbers of ach victim ordinarily suffering only a y. Such claims, if the Legislature actu- m, would be a paradigm class action. not include the word "method" in sts that the insertion of the word nothing to do with indirect purchaser

rting the word "method" in § 9 (1), ven contemplating antitrust actions at *ommercial Union Ins. Co., supra*, had ust violations, and there is nothing to out consumer plaintiffs' inability to as under G. L. c. 93A prompted the event should the mere insertion of the (1), an insertion made as part of a *Dodd* v. *Commercial Union Ins. Co.*, legislative decision to depart from the of both Federal and Massachusetts y precluded indirect purchaser claims *Brick.*[5] There is no reason to believe at overruling *Dodd* v. *Commercial* simultaneously intended a dramatic e's approach to antitrust remedies. this magnitude should not flow from draftsmanship. "It is not to be lightly nges in the law were intended where *Commonwealth* v. *Burke*, 390 Mass. *Ferullo's Case*, 331 Mass. 635, 637

s interpretation, we have not only a w but an irreconcilable conflict with gislature has announced in unambigu- usetts Antitrust Act was enacted in Supreme Court's decision in *Illinois*

lecision ten years later in *California* v. *ARC* 5 (1989), it was not even clear that the States om *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720

*Brick*. When the Legislature provided that the Massachusetts Antitrust Act "shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes," G. L. c. 93, § 1, it unambiguously announced that our State antitrust law would follow the principles articulated in *Illinois Brick*. See *Commonwealth* v. *Mass. CRINC*, 392 Mass. 79, 95 n.14 (1984) (upholding preliminary injunction in antitrust action brought by Attorney General, noting that *Illinois Brick* would prevent indirect purchaser consumers from recovering damages for increased prices). And, when it expressly made antitrust claims actionable under G. L. c. 93A, § 11, it provided that the interpretation of those provisions was "to be guided" by the provisions of G. L. c. 93, and thus by the Federal precedent (including *Illinois Brick*) applicable to antitrust actions. While each statute has some distinct provisions,[6] the underlying principles of Federal antitrust law were to be applied consistently across both statutes.

There is no question that the Legislature could, if it chose, adopt a contrary policy and reject *Illinois Brick*. See *California* v. *ARC Am. Corp.*, 490 U.S. 93, 103-105 (1989). To date, however, the Legislature has adhered to its original pronouncement, notwithstanding numerous attempts to eliminate the requirements of *Illinois Brick* from the State antitrust statute.[7] While it is the Legislature's choice whether to adopt or reject

[6]For example, the multiple damages provisions are quite different. Compare G. L. c. 93, § 12 (court may, but is not required to, award up to treble actual damages if antitrust violation was perpetrated "with malicious intent to injure" plaintiff), with G. L. c. 93A, § 11 (court must award at least double damages if defendant's violation of § 2 was "willful or knowing"). Similarly, while G. L. c. 93A, § 11, provides a procedural mechanism whereby a defendant may tender a reasonable settlement offer in its answer and thereby avoid liability for multiple damages, no such mechanism exists for actions brought under G. L. c. 93. Antitrust claims under G. L. c. 93, § 12, must be brought in the Superior Court, while claims under G. L. c. 93A, § 11, can be brought in either the Superior Court or the District Court. Thus, G. L. c. 93, § 14A, operates to prevent any blurring of an assortment of technical, procedural, and remedial distinctions between the two statutes, while G. L. c. 93A, § 11, announces that both statutes will follow the same basic principles of antitrust law.

[7]See 1981 House Doc. No. 5416; 1985 Senate Doc. No. 1071; 1986 Senate Doc. No. 1033; 1987 House Doc. No. 4104; 1990 Senate Doc. No. 101; 1991 Senate Doc. No. 1579; 1992 Senate Doc. No. 1563; 1993 Senate Doc. No. 120; 1994 Senate Doc. No. 82.

*Illinois Brick* as a matter of State law, it would be utterly self-defeating to adhere to *Illinois Brick* under one State statute governing antitrust violations (G. L. c. 93), deviate from it in one section of another State statute dealing with antitrust violations (G. L. c. 93A, § 9 [1]), and then adhere to it again in another section of the same statute (G. L. c. 93A, § 11). The policy choice at issue pits two diametrically opposed views. The adoption of both views simultaneously would leave us with the worst of both approaches and the benefits of neither.

Under the *Illinois Brick* approach, the policy choice is to streamline antitrust litigation, avoiding the cost, delay, and uncertainty involved in uncovering and quantifying the extent to which increased prices have or have not been passed along to manufacturers, wholesalers, distributors, retailers, and consumers beyond those who have purchased directly from the violator. As the court recognizes (*ante* at note 10), *Illinois Brick* is a necessary corollary of *Hanover Shoe, Inc.* v. *United Shoe Mach. Corp.*, 392 U.S. 481 (1968) (*Hanover Shoe*), which prevents antitrust defendants from defending on the ground that the plaintiff's claimed injury must be reduced by the extent to which the plaintiff passed on the price increase to others. Investigation of and litigation over all of the ripple effects of any single antitrust violation would be massive, and violators should not benefit from the fact that not all of the distant but theoretically affected purchasers will pursue their claims. Rather, in the interest of swift, efficient enforcement, and in the interest of requiring the violator to disgorge the full amount of whatever benefit it received from charging inflated prices, *Hanover Shoe* and *Illinois Brick* limit antitrust actions to the claims of direct purchasers and require that violators pay the entire amount of the overcharge to those direct purchasers.

The critics of *Illinois Brick* contend, with equal force, that antitrust violations injure persons far beyond the direct purchaser, and that the costs incurred (by both the parties and the courts) in identifying those victims and quantifying the amount of their injury are worthwhile in order to provide a remedy to all who have been injured. Allowing the direct purchaser to recover the entire amount by which it was overcharged, even if it passed on all or most of that overcharge

to others, results in a wi
expense of the true victi
precluded from any reco
investigative and analytical
accurate and comprehensiv
violations, and we should n
justice provided by *Illinois*

Both views have merit
decide which approach Ma
no sense, however, is to
same State court system.
*Illinois Brick* approach
Antitrust Act and G. L. c
proach is taken under G. L
proaches eviscerate each o
efficiency of *Hanover Sho*
ties and our courts will in
quantifying the damages
brought under G. L. c. 93
compensation for victims
of that enormous investiga
the Massachusetts Anti
precedent of *Hanover Sho*
able to actions brought un

Using the present case
undertake the daunting tas
one minute component in a
down through multiple c
distributors, and retailers.
to show that the plaintiff
products, paid any increase
labor-intensive investigatio
many other victims from
ers, distributors, and retail
merce and who will (by b

[8]Indeed, the tracing exercis
contract commitments or marke
chain were unable to pass on t
prices never filtered all the way

law, it would be utterly self-
'rick under one State statute
. L. c. 93), deviate from it in
e dealing with antitrust viola-
d then adhere to it again in
ıte (G. L. c. 93A, § 11). The
liametrically opposed views.
taneously would leave us with
the benefits of neither.

ɔach, the policy choice is to
voiding the cost, delay, and
ʒ and quantifying the extent to
ave not been passed along to
butors, retailers, and consum-
ısed directly from the violator.
: note 10), *Illinois Brick* is a
*ɪoe, Inc.* v. *United Shoe Mach.*
*ınover Shoe*), which prevents
ding on the ground that the
reduced by the extent to which
ıcrease to others. Investigation
ɜ ripple effects of any single
sive, and violators should not
of the distant but theoretically
eir claims. Rather, in the inter-
t, and in the interest of requir-
ull amount of whatever benefit
ed prices, *Hanover Shoe* and
tions to the claims of direct
ıtors pay the entire amount of
rchasers.

ontend, with equal force, that
rsons far beyond the direct
urred (by both the parties and
ɜ victims and quantifying the
thwhile in order to provide a
injured. Allowing the direct
re amount by which it was
ı all or most of that overcharge

to others, results in a windfall to the direct purchaser at the expense of the true victims farther down the chain, who are precluded from any recovery against anyone. We have the investigative and analytical tools with which to perform a more accurate and comprehensive analysis of the impacts of antitrust violations, and we should not settle for the rough and incomplete justice provided by *Illinois Brick* and *Hanover Shoe*.

Both views have merit, and it is up to the Legislature to decide which approach Massachusetts should take. What makes no sense, however, is to take both approaches at once in the same State court system. If, as the court has now decided, the *Illinois Brick* approach is taken under the Massachusetts Antitrust Act and G. L. c. 93A, § 11, while the opposite approach is taken under G. L. c. 93A, § 9, the two conflicting approaches eviscerate each other. We will not enjoy the pragmatic efficiency of *Hanover Shoe* and *Illinois Brick*, because the parties and our courts will incur all of the costs of identifying and quantifying the damages to indirect purchasers in actions brought under G. L. c. 93A, § 9. Nor will we enjoy the full compensation for victims that would otherwise justify the cost of that enormous investigatory effort, because the principles of the Massachusetts Antitrust Act (and hence the Federal precedent of *Hanover Shoe* and *Illinois Brick*) are still applicable to actions brought under G. L. c. 93A, § 11.

Using the present case as an example, the plaintiff will now undertake the daunting task of tracing how increased prices for one minute component in a variety of consumer products filtered down through multiple chains of manufacturers, wholesalers, distributors, and retailers. Such an exercise is necessary in order to show that the plaintiff, as the ultimate consumer of those products, paid any increased price at all.[8] As a byproduct of that labor-intensive investigation, the plaintiff's counsel will identify many other victims from the ranks of manufacturers, wholesalers, distributors, and retailers, victims who are in trade or commerce and who will (by both G. L. c. 93, § 1, and G. L. c. 93A,

[8]Indeed, the tracing exercise could ultimately show that, due to either contract commitments or market forces, entities higher up in the distribution chain were unable to pass on the increased prices, such that those increased prices never filtered all the way down to the consumer level.

law, it would be utterly self-
'rick under one State statute
. L. c. 93), deviate from it in
e dealing with antitrust viola-
d then adhere to it again in
ite (G. L. c. 93A, § 11). The
liametrically opposed views.
taneously would leave us with
the benefits of neither.

oach, the policy choice is to
voiding the cost, delay, and
g and quantifying the extent to
ave not been passed along to
butors, retailers, and consum-
ased directly from the violator.
: note 10), *Illinois Brick* is a
*ioe, Inc.* v. *United Shoe Mach.*
*inover Shoe*), which prevents
ding on the ground that the
reduced by the extent to which
icrease to others. Investigation
: ripple effects of any single
sive, and violators should not
of the distant but theoretically
eir claims. Rather, in the inter-
t, and in the interest of requir-
ull amount of whatever benefit
ed prices, *Hanover Shoe* and
tions to the claims of direct
itors pay the entire amount of
rchasers.

ontend, with equal force, that
rsons far beyond the direct
urred (by both the parties and
: victims and quantifying the
thwhile in order to provide a
injured. Allowing the direct
re amount by which it was
ı all or most of that overcharge

to others, results in a windfall to the direct purchaser at the expense of the true victims farther down the chain, who are precluded from any recovery against anyone. We have the investigative and analytical tools with which to perform a more accurate and comprehensive analysis of the impacts of antitrust violations, and we should not settle for the rough and incomplete justice provided by *Illinois Brick* and *Hanover Shoe*.

Both views have merit, and it is up to the Legislature to decide which approach Massachusetts should take. What makes no sense, however, is to take both approaches at once in the same State court system. If, as the court has now decided, the *Illinois Brick* approach is taken under the Massachusetts Antitrust Act and G. L. c. 93A, § 11, while the opposite approach is taken under G. L. c. 93A, § 9, the two conflicting approaches eviscerate each other. We will not enjoy the pragmatic efficiency of *Hanover Shoe* and *Illinois Brick*, because the parties and our courts will incur all of the costs of identifying and quantifying the damages to indirect purchasers in actions brought under G. L. c. 93A, § 9. Nor will we enjoy the full compensation for victims that would otherwise justify the cost of that enormous investigatory effort, because the principles of the Massachusetts Antitrust Act (and hence the Federal precedent of *Hanover Shoe* and *Illinois Brick*) are still applicable to actions brought under G. L. c. 93A, § 11.

Using the present case as an example, the plaintiff will now undertake the daunting task of tracing how increased prices for one minute component in a variety of consumer products filtered down through multiple chains of manufacturers, wholesalers, distributors, and retailers. Such an exercise is necessary in order to show that the plaintiff, as the ultimate consumer of those products, paid any increased price at all.[8] As a byproduct of that labor-intensive investigation, the plaintiff's counsel will identify many other victims from the ranks of manufacturers, wholesalers, distributors, and retailers, victims who are in trade or commerce and who will (by both G. L. c. 93, § 1, and G. L. c. 93A,

[8]Indeed, the tracing exercise could ultimately show that, due to either contract commitments or market forces, entities higher up in the distribution chain were unable to pass on the increased prices, such that those increased prices never filtered all the way down to the consumer level.

§ 11) still be bound by the constraints of *Illinois Brick*. We will have taken on all of the costs that *Hanover Shoe* and *Illinois Brick* seek to avoid, but, where G. L. c. 93A, § 11, and the Massachusetts Antitrust Act still adhere to *Hanover Shoe* and *Illinois Brick*, we will not reap the full benefits of incurring all those costs.[9]

Interpreting G. L. c. 93A, § 9 (1), in a manner that pursues these conflicting policies simultaneously means that the Legislature has made no policy choice at all. It is perfectly rational to follow *Hanover Shoe* and *Illinois Brick*, and it is perfectly rational to reject them. It is not rational both to follow and to reject them at the same time in the same court system, and we should not lightly infer such legislative schizophrenia.

[9]We must also invent some method of preventing the imposition of multiple liability. Antitrust defendants will, under G. L. c. 93, § 12, and *Hanover Shoe, Inc.* v. *United Shoe Mach. Corp.*, 392 U.S. 481 (1968) (*Hanover Shoe*), be liable to direct purchasers for the full amount of whatever inflated price resulted from the violation, without any reduction for the amount by which the direct purchaser passed on that inflated price to others. When an indirect purchaser consumer then claims that she has been injured because those same increased prices were passed down to her, she will be seeking to have the violator pay again for damages it has already paid in full.

Not surprisingly, most of the State Legislatures that have rejected *Illinois Brick* have simultaneously adopted provisions to address this multiple liability problem. Several States have effectively repealed *Hanover Shoe* along with *Illinois Brick*, allowing a defendant to defend on the ground that the plaintiff passed the overcharge on to others. See Haw. Rev. Stat. § 480-13(c)(2) (1993 & Supp. 2000); N.M. Stat. Ann. § 57-1-3(C) (2000); N.Y. Gen. Bus. Law § 340(6) (McKinney Supp. 2002); N.D. Cent. Code § 51-08.1-08 (1999). Others allow a setoff for amounts that the defendant has already paid to victims higher up the chain. See Idaho Code § 48-108(2)(a) (Supp. 2000); R.I. Gen. Laws § 6-36-12(a)(1) (2001); Wis. Stat. Ann. § 133.18(1)(a) (2001). Other States provide for transfer and consolidation of actions so that problems of multiple liability and duplicate recovery may be avoided at the outset. See D.C. Code Ann. § 28-4509(c) (2001); 740 Ill. Comp. Stat. § 10/7(2) (2001); Vt. Stat. Ann. tit. 9, § 2465(b) (Supp. 2001). Finally, others simply authorize the court to "take any steps necessary to avoid duplicative recovery against a defendant." Minn. Stat. Ann. § 325D.57 (2000). S.D. Codified Laws § 37-1-33 (2000). That our Legislature has done nothing to address the problem of multiple liability is one more reason to conclude that the 1979 amendments to G. L. c. 93A, § 9 (1), were not intended to repeal *Illinois Brick*. In the wake of today's opinion, we will have to craft a judicial solution to this problem with no legislative guidance, and, by definition, any solution we craft will be contrary to the unambiguous adoption of Federal antitrust principles in G. L. c. 93, § 1.

"[R]eason and comı
interpretive process,
intended to act in ac
415 Mass. 663, 668 (
Mass. 51, 53-54 (19
tion of a statute if t
absurd or unreasonal
*sex*, 387 Mass. 32
interpretation of G.
ignores the history u
results in the adoptic
that irrationally defe
those choices. The
*Illinois Brick* is di
consequences to clai
believe that the L
unambiguously in G
Legislature is free to
any articulation of s
of the word "metho
where it would lea
conflicting choices. ]

ıstraints of *Illinois Brick*. We will that *Hanover Shoe* and *Illinois* ere G. L. c. 93A, § 11, and the ill adhere to *Hanover Shoe* and the full benefits of incurring all

9 (1), in a manner that pursues imultaneously means that the cy choice at all. It is perfectly *ioe* and *Illinois Brick*, and it is ı. It is not rational both to follow time in the same court system, r such legislative schizophrenia.

of preventing the imposition of multiple ler G. L. c. 93, § 12, and *Hanover Shoe*, U.S. 481 (1968) (*Hanover Shoe*), be li- nount of whatever inflated price resulted tion for the amount by which the direct e to others. When an indirect purchaser en injured because those same increased will be seeking to have the violator pay in full.

Legislatures that have rejected *Illinois* ovisions to address this multiple liability ly repealed *Hanover Shoe* along with *Il-* defend on the ground that the plaintiff e Haw. Rev. Stat. § 480-13(c)(2) (1993 57-1-3(C) (2000); N.Y. Gen. Bus. Law N.D. Cent. Code § 51-08.1-08 (1999). hat the defendant has already paid to ho Code § 48-108(2)(a) (Supp. 2000); ); Wis. Stat. Ann. § 133.18(1)(a) (2001). consolidation of actions so that problems overy may be avoided at the outset. See ; 740 Ill. Comp. Stat. § 10/7(2) (2001); . 2001). Finally, others simply authorize to avoid duplicative recovery against a .57 (2000). S.D. Codified Laws § 37-1- done nothing to address the problem of o conclude that the 1979 amendments to led to repeal *Illinois Brick*. In the wake craft a judicial solution to this problem definition, any solution we craft will be ı of Federal antitrust principles in G. L.

"[R]eason and common sense are not to be abandoned in the interpretive process, as it is to be supposed that the Legislature intended to act in accordance with them." *Wild* v. *Constantini*, 415 Mass. 663, 668 (1993), quoting *VanDresser* v. *Firlings*, 305 Mass. 51, 53-54 (1940). "We will not adopt a literal construction of a statute if the consequences of such construction are absurd or unreasonable." *Attorney Gen.* v. *School Comm. of Essex*, 387 Mass. 326, 336 (1982). Here, the court's literal interpretation of G. L. c. 93A, § 9 (1), an interpretation that ignores the history underlying the 1979 amendments to § 9 (1), results in the adoption of inherently inconsistent policy choices that irrationally defeats the objectives to be served by either of those choices. The decision whether to follow or to reject *Illinois Brick* is difficult and controversial, with significant consequences to claimants, defendants, and the court system. I believe that the Legislature has in fact made its choice unambiguously in G. L. c. 93, § 1, and G. L. c. 93A, § 11. The Legislature is free to make the opposite choice, but I do not find any articulation of such a contrary choice in the mere insertion of the word "method" in G. L. c. 93A, § 9 (1), particularly not where it would lead to simultaneous pursuit of inherently conflicting choices. I therefore respectfully dissent.

# EXHIBIT B



YURKO, SALVESEN & REMZ, P.C.

# about

## Ciardi v. F. Hoffman-La Roche, Ltd.: Indirect Purchaser Actions Under G.L. c. 93A, Sec. 9

*By Richard J. Yurko and Matthew C. Welnicki*

**I. Introduction**

Antitrust lawyers, fasten your seatbelts, we are in for a bumpy ride. One recent Supreme Judicial Court decision has greatly altered the landscape of Massachusetts antitrust litigation. In February 2002, the SJC decided Ciardi v. F. Hoffman-La Roche, Ltd., 436 Mass. 53 (2002), in which the Court permitted consumers who are indirect purchasers to maintain class actions for antitrust violations, such as price-fixing, under Section 9 of the Massachusetts Consumer Protection Statute, G.L. c. 93A. Not only is the SJC decision important substantively, but it is sure to increase, dramatically, the number of antitrust class actions brought in Massachusetts under the rubric of c. 93A. This article outlines reasoning of the majority and dissent in this 4-3 opinion, as well as the decision's potential impact.

**II. The Ciardi Decision**

A. The Issue Presented in Ciardi

The United States Supreme Court has long held that only a direct purchaser, and not others in the chain of distribution, such as indirect purchasers, could bring an action under the federal antitrust laws. Illinois Brick Co. v. Illinois, 431 U.S. 720, 729-36 (1977); Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 206-208 (1990). In 1978, just after the Illinois Brick decision, the Massachusetts Legislature enacted the state Antitrust Act, G.L. c. 93, §§ 1-14A. Section 1 of the Act states that it is to be "construed in harmony with judicial interpretations of comparable fe antitrust statutes insofar as practicable." Thus, it was assumed that an in purchaser had no cause of action under G.L. c. 93, the state Antitrust Act Boos v. Abbott Labs., 925 F. Supp. 49, 51 (D. Mass. 1996)).

In Ciardi v. F. Hoffmann-La Roche, Ltd., 436 Mass. 53 (2002), indirect consumer purchasers of vitamin products brought a class action suit for damages arising from the defendant manufacturers' alleged price-fixing conspiracy. To circumvent the limitations imposed by Illinois Brick, the plaintiffs brought their claim not under the state Antitrust Act but rather u the Massachusetts Consumer Protection Act, G.L. c. 93A. Id. The Massachusetts appellate courts had never ruled on whether G.L. c. 93A c give rise to such a cause of action for indirect purchasers. The trial judge (Botsford, J.) denied the defendants' motion to dismiss, holding that indir purchasers could sue under c. 93A, and then reported this issue to the Ap

Court. The SJC then granted the parties' applications for direct appellate review to address this issue of first impression.

**B. The Majority Opinion**

In its opinion, the SJC confirmed the accepted wisdom that Illinois Brick prevented indirect purchasers from bringing actions based on the state antitrust law. Ciardi, 436 Mass. at 57. The Court, however, recognized th federal antitrust laws do not preempt states from enacting "Illinois Brick repealer statutes," which statutes expressly allow indirect purchasers to b claims based on traditional antitrust theories. Ciardi, 436 Mass. at 58, citi California v. ARC Am. Corp., 490 U.S. 93, 101-02 (1989). The Court ultim found that G.L. c. 93A was such a statute.

The SJC began its analysis by noting that G.L. c. 93A was a "statute of br impact which creates new substantive rights and provides new procedura devices for the enforcement of those rights." Id. at 58, citing Linthicum v. Archambault, 379 Mass. 381, 383 (1979). The consumer protection sectic the statute, and in particular, section 9(1) of Chapter 93A, through its incorporation of section 2, declares as unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of an trade or commerce . . . ." See id. at 58-59. The Court then noted that, ur the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), price-fixing constitutes an unfair method of competition. Id. at 59, citing FTC v. Natio Lead Co., 352 U.S. 419, 428-30 (1957). Because G.L. c. 93A, § 9, via sec 2, relies on interpretations of the FTC Act, price-fixing would also be unla under the state consumer protection statute. Id. at 60. This relationship proves to be a key aspect of the decision. In the view of the majority, G.L 93A, § 9, prohibits price-fixing through its link with the FTC Act, not the federal and state antitrust laws. This consumer protection path allowed se 9 to avoid the antitrust mandate of Illinois Brick.

According to the SJC, nothing in the express language of G.L. c. 93A, § 9, limits consumer protection actions for price-fixing to direct purchasers. Id 60. The Court found that G.L. c. 93A, § 9, permits any person to bring a consumer protection claim regardless of contractual privity with the defer Id. at 60. Relying upon the express language, the Court chose not to look the legislative history of the relevant statutes and permitted the majority ignore that the Legislature had declined opportunities to enact an Illinois repealer statute. Id. at 61, n.15.

The Court also rejected the defendants' argument that allowing indirect purchasers to bring suit for antitrust violations under the consumer prote statute, G.L. c. 93A, § 9, would give rise to an inconsistent interpretation G.L. c. 93A and G.L. c. 93. Id. at 62-63. While G.L. c. 93A, § 11 (the businessperson's right of action under c. 93A), includes a specific provisic that the interpretation of unfair methods of competition should be guided the provisions of the Antitrust Act, section 9 (the consumer's right of acti contains no such provision and, according to the majority, is therefore no bound by antitrust law or Illinois Brick. Id. at 63. The Court further found neither the Antitrust Act nor G.L. c. 93A were a "comprehensive statutory scheme enacted to govern all antitrust claims to the exclusion of the othe Id. at 64. This is not a case where a specific regulatory statute trumped t general provisions of G.L. c. 93A. Id.

The SJC's decision reflects a choice among conflicting public policy considerations. The majority acknowledged that Illinois Brick was premise on the policy of limiting the burdens that indirect purchaser lawsuits woul place on the judicial system, and (b) the policy of establishing an efficient means of making violators pay for their unlawful acts. Id. at 64, n.18. Th Court, however, noted that the Massachusetts Legislature was free to ma own policy decisions and determine whether to authorize indirect purchas suits. Id. at 67. It reasoned that the public would benefit from allowing su

suits and that the Massachusetts Legislature had intended to realize this benefit. Id. at 66-67.

C. The Dissent

The dissenting Justices in this closely-divided Court acknowledged that "r literally and by itself," G.L. c. 93A, § 9(1), permitted indirect purchasers t bring consumer protection claims based on antitrust theories. Ciardi, 436 Mass. at 68. The dissent argued, however, that such a reading ignores th Legislature's clear intent to adhere to the principles of Illinois Brick. The dissenting Justices did not agree with the majority's view that the expres language of G.L. c. 93A, § 9, amounted to a limited "repealing statute." I 68, 75-76. They tracked the evolution of the language of the statute and concluded that the inclusion of the term "method" as used in section 9(1) not have any impact on the prohibition against indirect purchaser antitrus actions. Id. at 69-75. They argued that the majority's opinion created an inconsistent application of Illinois Brick, whereby plaintiffs could bring ind purchaser claims, but only in the limited context of G.L. c. 93A, § 9(1). Ic 68.

**III. Impact of Ciardi**

A. Increased Litigation and Unanswered Questions

It is obvious that Ciardi will have a substantial and immediate impact on t number of antitrust cases which will be brought under Massachusetts consumer protection law. It opens the door to a previously unavailable re for indirect purchasers. Consumers that have paid an increased amount f services or products allegedly due to anticompetitive behavior will be able initiate an action against a price-fixing primary provider or manufacturer. Moreover, plaintiffs will be able to bring such claims as class actions. See c. 93A, § 9(2).

Over the years and continuing today, the Antitrust Division of the Departr of Justice brings scores of criminal cases each year alleging price-fixing a similar misconduct. Whenever those alleged conspiracies involve products which ultimately find their way into the hands of many Massachusetts consumers, the defendants will now likely find themselves facing a civil su from indirect purchasers in Massachusetts. Because of the availability of attorney's fees and the lure of statutory damages, knowledgeable class a firms will be brining these actions with some regularity, piggybacking on t work of the DOJ.

Beyond the sheer increase in the number of antitrust cases brought as pr consumer protection actions, the Ciardi decision leaves a number of ques unanswered. These include:

1. G.L. c. 93A, § 11, the Business Cause of Action

While Ciardi only explicitly addresses G.L. c. 93A, § 9, it strongly implies t by contrast, business claims brought under G.L. c. 93A, § 11, would be su to the indirect purchaser limitations of Illinois Brick. Ciardi, 436 Mass. at 63. The SJC noted that the Antitrust Act "shall have no effect upon the provisions of [c. 93A], except as explicitly provided in [c. 93A]." Id. at 62 quoting G.L. c. 93, § 14A. In turn, General Laws c. 93A, § 11, includes a provision, not found in section 9, which states that the Court should guide interpretations of Section 11 by the provisions of the Antitrust Act. Thus, logic goes, interpretations of Section 11 are guided by the Antitrust Act, w is in turn guided by federal antitrust law and Illinois Brick.

Because only section 9 provides a plaintiff the ability to bypass Illinois Bri businesses and government entities will likely not be able to maintain ind purchaser actions. See Cassano v. Gogos, 20 Mass. App. Ct. 348, 352 (19 (purpose of § 9 is to allow private persons to bring consumer protection s on their own behalf or as representatives of classes); see also John Beau Inc. v. Sentry Ins. A Mut. Co., 94 F. Supp. 2d 77, 111 n.37 (D. Mass. 19

Similarly, persons harmed while engaged in business will not be able to a themselves of this new rule. See G.L. c. 93A, § 9 (section does not apply persons covered by G.L. c. 93A, § 11). Section 11 is the exclusive remedy any person engaged in the conduct of any trade or commerce and who su damages due to the unfair methods of competition or unfair or deceptive of another engaged in trade or commerce. G.L. c. 93A, § 11.

2. Direct Purchasers

Even though Chapter 93 provides an appropriate remedy for direct purcha aggrieved by a defendant's anticompetitive behavior, the question remair whether these direct purchasers will be able also to bring an additional cla under Chapter 93A. Nothing in Ciardi prevents c. 93A, § 9, from applying direct purchasers. The SJC noted that neither Chapter 93A nor Chapter 93 exclusively governed anticompetitive behavior to the exclusion of the othe Ciardi, 436 Mass. at 64. Except where the price-fixing conspiracy is betwe retail outlets, direct purchasers will likely be those persons or entities eng in business, and therefore subject to the provisions of Section 11 rather t Section 9. Moreover, direct purchasers have a remedy under the Antitrust and claims under G.L. c. 93A would be, to some extent, redundant.

3. Attorney General Actions

Aside from facing both direct and indirect purchaser actions alleging antit violations, a defendant must also be concerned about suits initiated by th Attorney General. Under G.L. c. 93A, §§ 2, 4, the Attorney General has th duty to protect the interests of the public and is authorized to bring actior consumer protection violations. The Ciardi court recognizes that this statu scheme permits the Attorney General to defend the interests of indirect purchasers allegedly harmed by defendants that committed antitrust violations. Ciardi, 436 Mass. at 67, n.21. While new in the context of indir purchaser actions under G.L. c. 93A, § 9, Attorney General suits are not r concepts in antitrust enforcement. For instance, Chapter 93, section 9, authorizes the Attorney General to commence antitrust actions on behalf citizens of the Commonwealth. However, this begs the question of how pr class actions on behalf of indirect purchase-consumers might or might no mesh with similar actions brought by the state Attorney General.

B. Potentially Duplicative and Increased Damages

One concern that was highlighted by the Dissent in Ciardi is the fact that defendants in indirect purchaser antitrust suits under G.L. c. 93A may be subject to multiple overlapping damage awards. Ciardi, 436 Mass. at 78, Under Ciardi, a defendant may be liable to direct purchasers under Chapt as well as indirect purchasers under Chapter 93A. As the Dissent points o states that have repealed the Illinois Brick rule have adopted statutory protections to prevent this problem. Id. Massachusetts law however provi no such protection and, as a result, the Court "will have to craft a judicial solution . . . with no legislative guidance . . . and contrary to the unambig adoption of Federal antitrust principles in G.L. c. 93, § 1." Id.

Beyond the question of duplicative damage awards, Chapter 93A, § 9, als enables many plaintiffs to recover a larger amount of damages than those available under G.L. c. 93. The Antitrust Act allows a court to award up to treble damages if it finds that the violation was perpetrated with "maliciou intent to injure." G.L. c. 93, § 12. Chapter 93A, on the other hand, requir court to award multiple damages if the defendant's violation was "willful c knowing." G.L. c. 93A, § 9; Ciardi, 436 Mass. at 75, n.16. A finding of "wi or knowing" behavior also entitles the plaintiffs to attorney's fees, an enti proposition especially in the context of class actions. Most significantly, however, Chapter 93A, § 9, specifies that a successful plaintiff shall be awarded the greater of twenty-five dollars or her actual damages. For example, in a case like Ciardi, the class of plaintiffs could realistically inclu virtually every citizen of Massachusetts (because vitamin products have allegedly been included in most food items). This potentially transforms c

for a small but distinct overcharge to a select number of direct purchaser: a twenty-five-dollars-per-resident-of-Massachusetts claim.

Ciardi does not resolve the issues surrounding damages, and the Legislat has yet to step in and set rules and limits with respect to these amounts. Nonetheless, the possible exposure is daunting to any defendant that is n in one of these new consumer protection antitrust actions.
Indirect purchaser antitrust actions will likely feature a great number of plaintiffs often organized, or attempting to be organized, as a class. The t potential award against the defendants will be shifted from a few large dc per plaintiff amounts to a number of small dollar per millions of plaintiffs amounts. Coupled with the fact that attorney's fees and treble damages a available under G.L. c. 93A, plaintiff attorneys will not only welcome the chance to participate in such an action but will aggressively initiate these actions.

The class action members in indirect purchaser cases may never directly receive any payment from a settlement or judgment. In a large class acti any collected payment will likely be set aside for the general public. For example, in Ciardi, settlement proceeds may be used to fund state-wide nutrition programs as the plaintiffs' allegation is that every citizen of the Commonwealth was injured by the vitamin companies' price-fixing schem
C. Procedural Issues in Consumer Protection Enforcement of Antitrust Lav
The Consumer Protection Act and the Antitrust Act are distinct statutes w different procedural provisions. The following are instances where the par statutory requirements differ depending on whether the claim is brought the antitrust statutes or under G.L. c. 93A, § 9.

1. G.L. c. 93A Demand Letter

Under G.L. c. 93A, § 9, at least 30 days prior to initiating a consumer protection action, plaintiffs must first send the defendants a demand lette outlining their claims and damages with some degree of specificity. This affords the defendant an opportunity to tender a reasonable settlement o and avoid any additional damages. While this demand letter practice may well in most consumer protection actions, it could lead to some degree of difficulty where there is a large class of indirect purchasers. It would be difficult for parties accurately to assess damages of the large number of persons far down the line of manufacture and sale.
The majority in Ciardi assumes that the use of the twenty-five dollar base solves this problem of calculating damages. Ciardi, 436 Mass. at 67, n.20 This, in turn, raises the question of whether plaintiffs, regardless of their or perceived damages, will make a demand for twenty-five dollars each. I leads back to the constitutional issue of excessive damages awards for relatively minor injuries to the plaintiffs.
2. Statute of Limitations

Both the Antitrust Act and Chapter 93A provide a four year statute of limitations. See G.L. c. 93, § 13 (Antitrust Act); G.L. c. 260, § 5A (consur protection actions). The Antitrust Act, however, contains a statutory tollin provision which allows a civil action to be suspended during the pendency and for one year thereafter, of any civil or criminal proceeding brought by Commonwealth. G.L. c. 93, § 13. A direct purchaser plaintiff, therefore, c commence an action under G.L. c. 93 despite an indirect purchaser's inab to do so under G.L. c. 93A, § 9. See In re Coordinated Pretrial Proceeding Petroleum Products Antitrust Litigation, 782 F. Supp. 481, 484 (C.D. Cal. 1991)(applying FTC Act)(actions brought to enforce prohibitions against u or deceptive business acts are not considered to be antitrust actions unde scope of the government tolling provisions).
3. State District Court Actions

Chapter 93A, section 9, allows a person or entity to bring an action in eitl

the Superior or District Court. On the other hand, a plaintiff employing th Antitrust Act is limited to filing in the Superior Court. Realistically, most indirect purchaser actions will be in the form of large class action suits. It possible, however, that a single indirect purchaser would file an action in District Court, further complicating litigation pending in Superior Court.
4. Jury Trials

The interplay between G.L. c. 93A and G.L. c. 93 also raises the issue of whether plaintiffs in an indirect purchaser antitrust action will be entitled jury trial. The SJC has ruled that there is no such right to a jury trial unde G.L. c. 93A. Nei v. Burley, 388 Mass. 307, 315 (1983). The federal antitru laws, however, do afford plaintiffs the right to a jury trial. See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 504 (1959). See also In re U.S Financial Securities Litigation, 609 F.2d 411, 443 (9th Cir. 1990) (no exce to jury right in complex litigation). While the issue has not been resolved the Massachusetts courts or the Legislature, the Massachusetts Federal D Court has concluded that, to the extent claims under G.L. c. 93A parallel antitrust claims, they will be tried to a jury. Puretest Ice Cream, Inc. v. K Inc., 614 F. Supp. 994, 997 (D. Mass. 1985).

D. Difficulties in Prevailing on Indirect Purchaser Theory

The SJC in Ciardi simply recognized a cause of action under G.L. c. 93A fc unfair methods of competition that otherwise traditionally run afoul of the antitrust laws. It did not make a determination on the plaintiffs' likelihood success on the merits of the claim. The court commented only that the plaintiffs met their "relatively light burden" in surviving the motion to disr but whether "[they] can prove [their] claim is another matter entirely." C 436 Mass. at 65.
In many of these cases, the plaintiffs will be assisted by criminal convictic guilty pleas obtained by the Antitrust Division of the Department of Justic Nonetheless, even in those circumstances, to succeed in an indirect purch action, plaintiffs will be forced to demonstrate that any price-fixing or anticompetitive behavior caused price increases to be passed from the manufacturer to the seller and then passed on to the consumer. The plair must show the existence of an overcharge in the products they purchasec that the overcharge was a direct result of the defendants' behavior. This r prove to be a difficult task where the defendant manufacturers and plaint consumers are separated by several degrees of distributors and retailers.
E. The Future of Ciardi

Throughout its decision in Ciardi, the SJC focused on the fact that the Legislature has the ultimate authority and obligation to promulgate statut governing this area of law. Indeed, the Legislature could react to Ciardi b enacting law that either overrules Ciardi or clearly sets forth indirect purchasers' right to commence antitrust actions. In doing so, the Legislat could also resolve the issues regarding damages and procedure. Of cours Legislature could find that it is satisfied with the result in Ciardi and could choose to remain silent on this issue. If the Legislature takes this last approach, it would be up to the Courts to define the interplay between th Antitrust Act, G.L. c. 93, and the Consumer Protection Act, G.L. c. 93A, o case-by-case basis.

**IV. Conclusion**

The SJC's decision in Ciardi v. F. Hoffmann-La Roche opened the door to a form of antitrust actions. Indirect purchasers may now employ G.L. c. 93A 9, to bring claims for unfair methods of competition such as price-fixing. impact of Ciardi is that there will be a likely increase in both the number c antitrust actions initiated in the Commonwealth and the size of the damag awards and settlements defendants will pay to any combination of direct indirect purchasers. Ciardi's fate however is ultimately in the hands of the Legislature. All members of the SJC acknowledge that the Legislature has

ability to affirm, reject, or clarify its recent decision. In any event, Ciardi I greatly altered the present landscape of Massachusetts antitrust enforcem

"Ciardi v. F. Hoffmann-La Roche, Ltd.: Indirect Purchaser Actions Under C 93A, Sec. 9" is reprinted with permission from "Antitrust Essentials For Sr and Midsize Businesses and Their Lawyers: A Review of the Real World Antitrust Problems and How to Avoid Them (2002). @MCLE, Inc. All righ reserved.

Yurko, Salvesen & Remz, P.C. © 2005

# EXHIBIT C

No. 2001-P-1384

---

APPEALS COURT OF THE
COMMONWEALTH OF MASSACHUSETTS

---

COMMONWEALTH OF MASSACHUSETTS

V.

MARIA LANDRY

---

**BRIEF OF AMICI CURIAE
INFECTIOUS DISEASES SOCIETY OF AMERICA, BOSTON PUBLIC HEALTH COMMISSION, CAMBRIDGE CARES ABOUT AIDS, TAPESTRY HEALTH SYSTEMS, PROVINCETOWN AIDS SUPPORT GROUP, CAMBRIDGE PUBLIC HEALTH DEPARTMENT, AMERICAN PUBLIC HEALTH ASSOCIATION, MASSACHUSETTS PUBLIC HEALTH ASSOCIATION, NATIONAL ALLIANCE OF STATE AND TERRITORIAL AIDS DIRECTORS, MASSACHUSETTS NURSES ASSOCIATION, AIDS ACTION COMMITTEE OF MASSACHUSETTS, AIDS PROJECT WORCESTER, LYNN HEALTH TASK FORCE, MULTICULTURAL AIDS COALITION, LATIN-AMERICAN HEALTH INSTITUTE, HEALTH CARE OF SOUTHEASTERN MASS, FENWAY COMMUNITY HEALTH CENTER, MASSACHUSETTS ASIAN AIDS PREVENTION PROJECT, NORTH SHORE AIDS HEALTH PROJECT**

*(Additional Amici continued on inside cover)*

---

Bennett H. Klein
BBO # 550702
Gay & Lesbian Advocates & Defenders
AIDS Law Project
294 Washington Street
Suite 301
Boston, MA 02108
(617) 426-1350

ATTORNEY FOR AMICI CURIAE

> seek and will be placed in contact with substance abuse treatment and health care.

St. 1993, c. 110, § 142, codified at G.L. c. 94C, § 27(f). Based on the plain and unambiguous language of these two statutes, once a person lawfully obtains needles from a program implemented by DPH under G.L. c.111, § 215, G.L. c. 94C, § 27(f) plainly provides that possession of those needles "shall not be a crime," without any geographical restriction or requirement that the person exclusively remain in the city or town in which the program is sited.

**A. The Unambiguous Language Of G.L. C. 111, § 215 And G.L. C. 94C, § 27(f) Demonstrates That It Is Not A Crime For An Enrollee In A Needle Exchange Program In A Particular City Or Town To Possess Needles Or Syringes In Another City Or Town That Has Not Granted Local Approval For The Siting Of A Needle Exchange Program.**

#2

It is a settled rule of statutory construction that a statute "must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished ..." Commonwealth v. Smith, 431 Mass. 417, 421 (2000). As the Supreme Judicial Court has repeatedly emphasized, "the statutory language itself is the principal source of insight into the legislative purpose." *Id.* at 421 (quoting Registrar of Motor Vehicles v. Board of Appeal on Motor Vehicle Liability Policies & Bonds, 382 Mass. 580, 585 (1981)). "Where ... the language of a statute is clear and unambiguous, it is conclusive as to the intent of the Legislature." Ciardi v. F. Hoffman-La Roche, Ltd., 436 Mass. 53, 60-61 (2002). Moreover, two statutes relating to the same subject "clearly are to be construed harmoniously so as to give full effect to all of their provisions and give rise to a consistent body of law." *Id.* at 62.

# EXHIBIT D

Case 1:05-cv-11350-MLW Document 26-3 Filed 03/20/2006 Page 2 of 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

01-11602-JNF

CHAPTER 7

IN RE RICHARD L. LIVINGSTON ) ORDER

Upon consideration of the motion of Margaret Clifford for relief from the automatic stay of proceedings, a hearing having been held on said motion and all parties having been notified of said hearing, and with good cause appearing therefore, this court makes its *ORDER* as follows:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Automatic Stay in the above Bankruptcy proceeding is vacated and extinguished for all purposes as to the Movant, her assignees and/or successors in interest, and the Movant may proceed to assert her rights against the Debtor within the divorce proceeding between the Debtor and Clifford and more fully described in Livingston v. Livingston, Norfolk County Probate and Family Court, Docket No. 97D1237-D1 by means any means necessary, all pursuant to applicable state and federal law.

IT IS FURTHER ORDERED that Clifford is relieved from the Rule 4001 (a) (3) stay, such that she is allowed to proceed against the Debtor immediately upon the Court's signing of this Order.

April 24, 2001
Date

Joan N. Feeney
Bankruptcy Judge

DOCKETED

25

# EXHIBIT E

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.

PROBATE & FAMILY COURT
DEDHAM DISTRICT
NO. 97D1237

MARGARET CLIFFORD-LIVINGSTON,

Plaintiff

V.

RICHARD LIVINGSTON,

Defendant

TRANSCRIPT OF HEARING
HELD IN THE NORFOLK PROBATE & FAMILY COURT
BEFORE KOPELMAN, J.
SEPTEMBER 20, 2001

APPEARANCES:

| | |
|---|---|
| For the Plaintiff<br>Margaret Clifford-Livingston: | Eunmi Lee, Esq.<br>15 Court Square<br>Boston, MA 02108 |
| For the Defendant<br>Richard Livingston: | William E. Gately, Esq.<br>400 Washington Street<br>Braintree, MA 02185 |
| Transcriber | Karen Lincoln<br>309 High Street<br>Hingham, MA 02043<br>(781) 740-9296 |
| Transcription Company | Office Solutions Plus, Inc.<br>30 Chestnut Street<br>Quincy, MA 02169<br>(617) 471-3510 |

Proceedings recorded by electronic sound recording equipment

THE COURT: Livingston matter. Parties and counsel?

ATTY. GATELY: Afternoon, Your Honor, Attorney William Edward Gately on behalf of Richard Livingston. Richard Livingston is also present.

ATTY. LEE: Good afternoon, Your Honor, [inaudible].

THE COURT: Okay, now let's see. What's the story. This was a contempt judgment that was entered in May?

ATTY. LEE: Yes, in May. May 24th of 2001.

THE COURT: And it's a motion to reconsider it?

ATTY. GATELY: No, Your Honor, it's actually a motion for clarification. What has happened [inaudible], what has basically happened, Your Honor, is that after the order was issued Ms. Clifford went out without notice to Mr. Livingston, refinanced, well actually didn't refinance the property, took out a new mortgage paying off the first and second mortgage.

THE COURT: Isn't that like letting him off the hook?

ATTY. GATELY: Well, he was already off the hook, Your Honor, because his obligation was discharged under the bankruptcy statute. Okay, but the divorce [inaudible] agreement does give him…

THE COURT: Let me just stop you for a minute. First of all, let me just ask, you're name is what?

ATTY. GATELY: Yes, Attorney William Gately, Your Honor.

THE COURT: And you represent Mr.?

ATTY. GATELY: Mr. Livingston, yes sir.

THE COURT: And they're now divorced?

ATTY. GATELY: Yes, Your Honor.

THE COURT: Okay, and your name is what?

ATTY. LEE: Eunmi Lee.

THE COURT: How do you spell it?

ATTY. LEE: E-U-N-M-I, L-E-E.

THE COURT: E-U-N-M-I, L-E-E.

THE COURT: And you're representing…

ATTY. LEE: Margaret Clifford.

THE COURT: The former wife?

ATTY. LEE: Yes.

THE COURT: Okay. All right. No, but it takes him off the hook in the sense that aside from his obligation to the mortgagee, it takes him off the hook vis-a-vie her. He could be discharged in bankruptcy, but that doesn't relieve him from his child support obligation.

ATTY. GATELY: Your Honor, the mortgage was not a child support obligation.

THE COURT: I don't necessarily agree with that. His obligation to pay mortgages can be deemed in the nature of child support. As a matter of fact, looking at my judgment, it said that as a result of his filing for bankruptcy, I found that it was unlikely any lender would furnish funds necessary for the parties to refinance the first and second mortgages. But she had agreed to do it to pay marital debt. Then I went

on to say that in lieu of his obligation to pay the first mortgage of $1,300.00, that he pay a child support order. The deal was he was supposed to be paying the mortgages in lieu of child support. So if he discharges those mortgages in bankruptcy, discharges his obligation to pay the mortgagee, he doesn't take a walk on his family for child support.

ATTY. GATELY: And he was not seeking a walk on his family, your Honor.

THE COURT: But that's what this judgment did. It just transferred the obligation so he has to pay child support instead of the mortgage payment.

ATTY. GATELY: And again, Your Honor, but what we have now is we have without notice to Mr. Livingston, she went out and got a new mortgage, paid off the first and second mortgage, paid off other debt, all right. Now...

THE COURT: What's wrong with that?

ATTY. GATELY: Well, that's what we're asking for, Your Honor.

THE COURT: She took advantage of the lower mortgage rates.

ATTY. GATELY: Without notice to Mr. Livingston, Your Honor.

THE COURT: How is he hurt by it? She's the one that signed the mortgage documents.

ATTY. GATELY: How is he hurt by it? First of all, Your Honor, the mortgage is taken for $160,000.00 which is one-half of the assessed value. She does that while the case is in bankruptcy. As a matter of fact, this matter is still in bankruptcy because the Bankruptcy Court has not released or filed a no asset report with the court so that real estate, Your Honor, is the only, is the only bankruptcy estate asset to pay all of the creditors and including…

THE COURT: But he's going to be discharging his creditors in bankruptcy, isn't he?

ATTY. GATELY: That may or may not be the case, Your Honor. The problem is is that he has a mortgage and he has a house, at least a one-half interest, in the amount of $160,000.00 in equity value. Far in excess, and this is the net equity, this is the net equity interest far in excess of what his share of the debt would have been. So if the Bankruptcy Court hasn't…

THE COURT: Mr. Gately, can you do me a favor and not sway side to side, I'm getting seasick watching you.

ATTY. GATELY: Certainly, Your Honor. So the bottom line being the Bankruptcy Court still has control of that property. She didn't have any right to refinance it.

THE COURT: So take it up with the Bankruptcy Court.

ATTY. GATELY: Well that's why we're asking for clarification here. The other thing is…

THE COURT: What is it you want me to clarify?

ATTY. GATELY: Your Honor, what we're asking is, you entered two paragraphs that deal with the refinance.

THE COURT: Let me read the whole order. I said because of this filing for bankruptcy it is unlikely any lender will furnish funds necessary to refinance the first and second mortgage which he had agreed to do in the separation agreement.

ATTY. GATELY: Exactly, which is a property interest he charged in bankruptcy.

THE COURT: All right, and then it says had the refinance taken place she would have been relieved from paying the second mortgage of $42.00 a week.

ATTY. GATELY: She …

THE COURT: They were going to be consolidated into a first mortgage. All right, he had agreed under the separation agreement to pay $1,300.00 a month or $300.00 a week in lieu of child support. Let's see, and due to the complications created by the former husband, [inaudible] you don't have a neurological difficulty do you?

ATTY. GATELY: No, I have an excess of energy as a result of being here for a couple of hours under some unpleasant circumstances, Your Honor.

THE COURT: Sorry to hear that.

ATTY. GATELY: Thank you, Your Honor.

THE COURT: [Inaudible] Ms. Crawford [inaudible].

ATTY. GATELY: No, Your Honor, she has been extremely helpful.

THE COURT: Okay, let me keep reading. So to avoid further confusion due to the complications created by bankruptcy, what we did is convert his obligation to pay the mortgage into a straight child support obligation and that was $342.00 a week for the two children payable to the Department of Revenue. Then it said, by wage assignment, then it went on to say that there was counsel fees awarded pursuant to [inaudible] 38 to be deducted from his share of the net proceeds. What's the address of the property?

ATTY. GATELY: 15 Quarry Lane, Your Honor, Milton, Massachusetts.

THE COURT: Quarry Lane in Milton. Okay, let me keep reading. The aforesaid counsel fee shall be deducted from his share. Now, was that property required to be sold at a certain time?

ATTY. GATELY: Yes, Your Honor, upon emancipation of the youngest child.

THE COURT: Okay, upon emancipation of the youngest child and what are the names and ages of the two children?

ATTY. GATELY: The oldest is Siobhan.

THE COURT: How do you spell that?

ATTY. GATELY: S-I-O-B-H-A-N.

THE COURT: S-I-O-B-H-A-N. How old hold is Siobhan?

ATTY. GATELY: She's 20 years old, May 29th.

THE COURT: Okay, so she's 20. Is she a full-time student now?

ATTY. GATELY: Yes, she is, sir.

THE COURT: Okay and the younger child?

ATTY. GATELY: Is Brendan, B-R-E-N-D-A-N.

THE COURT: How old is Brendan?

ATTY. GATELY: 14.

THE COURT: So on Brendan's emancipation the house has to get sold and they each get what? One-half?

ATTY. GATELY: One-half of the interest had it not been, one-half of the share.

THE COURT: [Inaudible] okay. The former wife and the right to refinance the first and the second in order to satisfy the first and second because the mortgage rates had come down so she wanted to take advantage of that and consolidate it and take out [inaudible] marital debt. By the way, under the agreement, weren't they obliged to do that?

ATTY. LEE: Yes, Your Honor.

THE COURT: Pay marital debt?

ATTY. LEE: Yes.

THE COURT: That's my memory, but…

ATTY. GATELY: It was, Your Honor.

THE COURT: Where does it say that? Where am I looking, here?

ATTY. GATELY: Page 11, I believe.

THE COURT: Page 11. Let me take a look. [Inaudible] will be responsible for joint credit cards, okay, so both parties were responsible for one-half of the joint credit card debt for First America, First USA, Bravo, Household Credit and a Greenwood Trust account. Wife is solely responsible for student loans.

ATTY. GATELY: Please not wife is solely responsible for all student loans, Your Honor.

THE COURT: Yes, she is solely responsible, okay. Then it says at wife's election, husband agrees to cooperate in refinancing the marital home to consolidate the first and second mortgages and the outstanding credit card and the Bank Boston loan. I didn't see the Bank Boston loan.

ATTY. GATELY: That was taken out by Judge [inaudible] because she struck it from there.

MS. CLIFFORD-LIVINGSTON: I paid that.

THE COURT: All right. After the refinance, husband will pay the principal and interest of the first one, that would be the new mortgage, which is presently approximately $116,000.00 and the principal interest reflected in one-half of the credit card [inaudible] one-half of the…so he's, I don't understand this. He's to continue to pay the credit card debt?

ATTY. GATELY: One-half of it.

MS. CLIFFORD-LIVINGSTON: No, we were…

THE COURT: One-half, but I thought the purpose of the refinance was to get rid of some of this credit card debt.

MS. CLIFFORD-LIVINGSTON: It was.

ATTY. LEE: Yea, they were to refinance for a second.

THE COURT: So why would he pay half the credit card.

MS. CLIFFORD-LIVINGSTON: Whatever, say the amount was $30,000.00, we would each be responsible for $15,000.00 of that so that portion of the mortgage.

ATTY. GATELY: It was going to be reapportioned.

THE COURT: Reapportioned, oh, so what was the existing first...first of all does anyone have a rough idea of what the fair market value is of the Milton house?

ATTY. GATELY: Yes, fair market value of the house right now. In January there was an appraisal [inaudible] the MBTA credit union by certified registered appraisal.

THE COURT: And what....

ATTY. GATELY: $340,000.00. The house down the street just sold two months ago for $388,000.00 which would leave the property at least $370,000.00 fair market value.

MS. CLIFFORD-LIVINGSTON: [Inaudible] Your Honor.

THE COURT: Well I suppose it will sell for whatever it will sell for...

ATTY. GATELY: Exactly.

THE COURT: I just wanted to get a rough idea.

MS. CLIFFORD-LIVINGSTON: Around $300,000.00.

ATTY. GATELY: The appraisal, Your Honor, that was used as a basis for a loan, all right, as you...

THE COURT: [Inaudible] conservative.

ATTY. GATELY: Exactly. You're [inaudible] was $340,000.00.

THE COURT: Let us use the $340,000.00 just to get a ball park [inaudible] sell for more. Anyway, $340,000.00.

ATTY. GATELY: [Inaudible] given it was only seven months old and what we're going through slide back on the sale prices.

THE COURT: I'm going to use the figure $340,000.00 [inaudible]. Now what was the amount of the, what was the principal loan balance at the time [inaudible] the first mortgage?

ATTY. GATELY: $106,000.00 on the first mortgage and $12,000.00 on the second mortgage.

MS. CLIFFORD-LIVINGSTON: $16,000.00 on that I think.

THE COURT: How much on the second?

MS. CLIFFORD-LIVINGSTON: It was $16,000.00 at that time and I paid it.

THE COURT: You just said $116,000.00 that's the first mortgage.

MS. CLIFFORD-LIVINGSTON: Right, it was $116,000.00 and it was

ATTY. GATELY: How much on the second?

MR. LIVINGSTON: The second mortgage is $12,000.00.

MS. CLIFFORD-LIVINGSTON: I think that's right.

THE COURT: $12,000.00 so it was $128,000.00 as of the date of this agreement, December 14, the separation agreement, December 14…oh by the way [inaudible] you don't have to stay unless you want to, it's up to you, if you want to stay you can.

VICTORIA SCHEPPS: [Inaudible]

MS. CLIFFORD-LIVINGSTON: You don't want to miss any of this do you?

VICTORIA SCHEPPS: No, I wanted to get [inaudible].

THE COURT: You mean on arrearage?

VICTORIA SCHEPPS: Yes.

THE COURT: Why don't you get it from DOR [inaudible]. All right, so, it's $128,000.00 and then you went ahead and refinanced [inaudible] the property?

MS. CLIFFORD-LIVINGSTON: Yes.

THE COURT: What did you, you took out a new mortgage?

MS. CLIFFORD-LIVINGSTON: I did.

THE COURT: What's the amount of the mortgage that you took out?

MS. CLIFFORD-LIVINGSTON: $160,000.00.

ATTY. LEE: $160,000.00.

THE COURT: $160,000.00. And now for $160,000.00 I assume the $128,000.00 got paid off.

MS. CLIFFORD-LIVINGSTON: Yes.

ATTY. GATELY: Which was much lower by then, Your Honor.

THE COURT: What was it when you paid it off? Do you recall?

MS. CLIFFORD-LIVINGSTON: [Inaudible].

THE COURT: Approximately.

ATTY. GATELY: Again, Your Honor, I subpoena in the refinanced documents which…

MS. CLIFFORD-LIVINGSTON: $116,000.00…

THE COURT: Well, all right…

MS. CLIFFORD-LIVINGSTON: Roughly around $120,000.00 but then I paid.

THE COURT: Approximately $120,000.00 [inaudible].

MS. CLIFFORD-LIVINGSTON: [Inaudible].

ATTY. GATELY: Partial, Your Honor.

THE COURT: All right, you want to step up? You handled the refinance did you?

VICTORIA SCHEPPS: [Inaudible], Your Honor, I was the closing attorney and I paid off…

THE COURT: What was the payoff on the first mortgage?

VICTORIA SCHEPPS: That's what I'm looking for. Just bear with me.

THE COURT: Take your time.

VICTORIA SCHEPPS: There was also a lien that was paid off and a [inaudible]. First mortgage was roughly 107.

THE COURT: Okay, 107 was the first.

VICTORIA SCHEPPS: Right.

THE COURT: Okay, what about the second?

VICTORIA SCHEPPS: 12,250, 12,210.

THE COURT: 12,210. One second, then there was a lien

MS. CLIFFORD-LIVINGSTON: Actually two liens

VICTORIA SCHEPPS: Two liens, yes.

THE COURT: What was the lien?

VICTORIA SCHEPPS: Credit card lien and there was a settlement that was made prior to closing on that and it came in at roughly 4 [inaudible].

MS. CLIFFORD-LIVINGSTON: It was around $4,039 something.

THE COURT: $4,000. Which credit card?

MS. CLIFFORD-LIVINGSTON: And that was after I negotiated it down. That was…

VICTORIA SCHEPPS: Discover.

THE COURT: Discover. Is that Greenwood Trust.

MS. CLIFFORD-LIVINGSTON: Yes.

VICTORIA SCHEPPS: Yes.

ATTY. GATELY: Yes, Your Honor.

MS. CLIFFORD-LIVINGSTON: And National City was [inaudible].

VICTORIA SCHEPPS: [Inaudible].

THE COURT: National City, you can round it off. $3,000 National City. Okay, anything else that was paid off?

VICTORIA SCHEPPS: Yes.

THE COURT: What else?

VICTORIA SCHEPPS: Another loan to RAH.

ATTY. GATELY: That was the second mortgage, Your Honor.

VICTORIA SCHEPPS: No, the second mortgage…there were two.

MS. CLIFFORD-LIVINGSTON: There was another one. In order to secure the mortgage they told me I had to pay off debts that were mine and I'm not asking that he accept any of that.

THE COURT: Okay, RAH you're talking about?

VICTORIA SCHEPPS: Yes. The second mortgage holder.

THE COURT: Okay, that's RAH. There was a second payment made?

VICTORIA SCHEPPS: That's correct.

THE COURT: And that's on wife's debts?

MS. CLIFFORD-LIVINGSTON: Yes and…

THE COURT: Just a minute.

MS. CLIFFORD-LIVINGSTON: I'm sorry.

THE COURT: Before we get into wife's debts, anything else that was joint debt that was paid off?

MS. CLIFFORD-LIVINGSTON: No.

VICTORIA SCHEPPS: Water and sewer.

THE COURT: First mortgage, second mortgage.

VICTORIA SCHEPPS: [Inaudible].

THE COURT: Water.

ATTY. GATELY: Water and sewer are not a joint debt, Your Honor, under the divorce [inaudible]. Ms. Clifford's obligation.

THE COURT: Okay, so let's take that off. Okay, anything else that was like credit card debt?

VICTORIA SCHEPPS: National City credit card [inaudible].

THE COURT: National City [inaudible]. Is that basically it? What were the closing costs?

VICTORIA SCHEPPS: $4,700.

THE COURT: $4,700 on closing costs?

VICTORIA SCHEPPS: They were 1½ points. That does include escrow money [inaudible] out of that is…

THE COURT: The escrow money is, that's payments, right? What are the escrows?

VICTORIA SCHEPPS: Yes, take out roughly $1,000 for taxes and insurance [inaudible].

THE COURT: So it's $3,700?

VICTORIA SCHEPPS: Right, and that doesn't include the [inaudible].

THE COURT: So $3,700 represents points and attorney's fees?

VICTORIA SCHEPPS: And title insurance, recording fees.

THE COURT: Okay, all of it. Ballpark $3,700.

VICTORIA SCHEPPS: Yes.

MS. CLIFFORD-LIVINGSTON: And, Your Honor, in all the refinancings that we went to, I think five or six and never closed, they were all for 10½% in order to get this rate that's why it was a little bit higher.

THE COURT: What rate did you ultimately get?

MS. CLIFFORD-LIVINGSTON: 7¼ .

THE COURT: 7¼ .

MS. CLIFFORD-LIVINGSTON: And our credit was so bad they wanted us to do 10½ on everything else.

THE COURT: 10½ is ridiculous.

MS. CLIFFORD-LIVINGSTON: 7.6

THE COURT: 7. …

VICTORIA SCHEPPS: 625. 7 5/8.

MS. CLIFFORD-LIVINGSTON: And the second was at 10 ½ before and the first was at 8½.

THE COURT: Adjustable?

VICTORIA SCHEPPS: It's a 30 year adjustable.

THE COURT: So it was 8½ was the first and the second was how much? 10? What was it?

MS. CLIFFORD-LIVINGSTON: The second was 10.5.

VICTORIA SCHEPPS: [Inaudible].

THE COURT: I don't need that yet. Okay, why don't you wait though. So let me just see what we've got for extinguishing debt. $107,000 plus $12,210 on the second plus

$4,000 plus $3,000 plus $4,700. Okay, I've got $129,910. So roughly $130,000 but you got $160,000.

MS. CLIFFORD-LIVINGSTON: Correct, Your Honor.

THE COURT: Okay.

ATTY. LEE: She does have other credit cards, Your Honor, that she hasn't paid off yet.

THE COURT: But those are her credit cards.

ATTY. LEE: No, those are joint that he has…

VICTORIA SCHEPPS: She has to pay that at some point.

ATTY. GATELY: They are not joint, Your Honor, because they were discharged.

MS. CLIFFORD-LIVINGSTON: Well, it doesn't mean they go away.

THE COURT: Let me say this. As far as I'm concerned this is what I understand. Where it says the parties to be responsible for joint credit card debt, even if he discharged it and she's solely liable, he's still responsible to her to pay half. He doesn't discharge it and thereby leave her saddled with the entire debt.

ATTY. GATELY: Your Honor, that's not the way the case law reads. Under the Bankrupcty Law…

THE COURT: How could it be bankruptcy law? I'm not following bankruptcy, I'm following what their agreement, contract law.

ATTY. GATELY: Contract law, Your Honor.

THE COURT: It says the parties shall continue to be [inaudible] responsible for joint credit card debt.

ATTY. GATELY: Exactly and consistent with that agreement, credit card debt is a property, is a property interest, as is the first and second mortgage. Those interests are dischargeable through bankruptcy.

THE COURT: I understand [inaudible].

VICTORIA SCHEPPS: Not here, Your Honor.

THE COURT: But that doesn't…you can't discharge it in bankruptcy if she's now left holding the bag when he signs and agreement that says he's responsible for half the debt. His obligation won't run to the creditors, it runs to her. Counselor, I don't want to debate it with you any further. It's a simple issue. If there's $10,000 in marital debt, he signs an agreement saying their each going to have to pay one-half of the debt, and he discharges it in bankruptcy, there's no court, probate court in North America that's going to say madam you pay the $10,000 and sir even though you agreed with her on a contract [inaudible] to pay half the debt you get a free walk. It isn't going to happen. She's got rights of indemnification.

ATTY. GATELY: Which, Your Honor, were, which were gone when the Bankruptcy Court issued the discharge.

THE COURT: I don't agree.

ATTY. LEE: [Inaudible], Your Honor [inaudible].

THE COURT: It may have discharged him, but vis-a-vie [inaudible] First America, Greenwood Trust and all of those [inaudible].

ATTY. GATELY: Yes, sir.

THE COURT: He may have, he doesn't have a dime, I agree with you.

ATTY. GATELY: And if there was a contribution, Your Honor, which is also a property and contract claim, Margaret Clifford, Margaret Livingston, was a creditor under that bankruptcy. There was no objection to the discharge against her or against anybody else. They're gone, Your Honor.

ATTY. LEE: No, Your Honor, we received a release [inaudible] to come back here for Your Honor to adjudicate.

THE COURT: I just want to find out what the basis facts are. You and I don't agree on the theory. $130,000 was used to…that she used to discharge debts running to, that were joint debts.

ATTY. LEE: Yes.

THE COURT: I understand it was discharged, but they were nevertheless incurred by both. She then elected to discharge it by payment and that's $130,000. Now, the problem I'm having is, and the only problem I'm having with the case frankly, is this, in theory, if there were $130,000 in obligations and she goes out, and I'm not saying you did it, well, let's take your case. You go out and you refinance it for $160,000 and you

walk away with $30,000 in your pocket. I don't know what, I'm going to come to that. If you were to walk away with $30,000 and take a trip to wherever, Hawaii.

MS. CLIFFORD-LIVINGSTON: That wouldn't be fair and I didn't do that.

THE COURT: He shouldn't have his half of the equity incumbent…

MS. CLIFFORD-LIVINGSTON: 100% agreement.

THE COURT: [Inaudible] the $130,000 that you chose to…

MS. CLIFFORD-LIVINGSTON: I'm in 100% agreement.

THE COURT: To refinance. So now the question is where did the extra $30,000 go that didn't go to pay marital debt as the parties had agreed to pay it and the first and second mortgage.

ATTY. GATELY: In violation of the separation agreement quite a bit of that money went to pay off her student loans, Your Honor.

MS. CLIFFORD-LIVINGSTON: I'm not disputing that.

ATTY. LEE: [Inaudible].

ATTY. GATELY: [Inaudible].

THE COURT: I can't listen to everyone at the same time. Whatever she used out of the $160,000 that discharged her sole obligation is going back into the equity so it's not going to…

ATTY. GATELY: That's assuming that that mortgage can be paid off, Your Honor. It's in violation of your order.

THE COURT: The mortgage is going to have to be paid off at the time of sale. The property has to be sold.

ATTY. GATELY: Your Honor, it may have to be paid off if she has the ability to pay it off.

THE COURT: No, no, no. The property is going to be sold. Out of the sale is going to come $160,000 which is the new mortgage.

ATTY. GATELY: But for the fact that Mr. Livingston doesn't own that $160,000 because he's not a party to the mortgage.

THE COURT: I understand it, but the house has to get sold when the youngest is emancipated.

ATTY. GATELY: Exactly.

THE COURT: When it gets sold the mortgage is going to get paid. $30,000 of that mortgage is going to be put back into the equity of the house in which he is going to be sharing.

ATTY. GATELY: And it will be sold assuming that the house is worth $340,000 when it's sold.

THE COURT: I'm assuming it's going to be worth more than $160,000 isn't it.

ATTY. GATELY: You would certainly hope so, Your Honor. She'll need at least that amount to pay her share.

THE COURT: Whatever she has to put in she pays out of her share.

ATTY. GATELY: But putting on top of that, Your Honor, the bottom line is that it's $160,000 plus the interest that will accrue.

THE COURT: She's paying the mortgage, not him.

MS. CLIFFORD-LIVINGSTON: I'm paying it.

ATTY. GATELY: I understand that, Your Honor, but when a payoff figure comes it's going to come at 160% plus 7. whatever.

THE COURT: It's going to be, no, the payoff figure is going to be what's owned of the balance of the mortgage.

ATTY. GATELY: Exactly. Keeping in mind that as the mortgage runs, the interest adds to that balance, Your Honor, do you follow? If you were to pay off today, she'd have to pay $160,000.

THE COURT: But the initial payments in the mortgage are practically all interest. They're practically all interest. By the time that mortgage gets paid, a lot of that interest is being paid. Your initial seven years of a mortgage is the interest, you're not getting any break on the principal.

ATTY. GATELY: Again, Your Honor…

THE COURT: She's paying it.

ATTY. GATELY: Again, Your Honor, assuming it gets paid. The problem we have is that under the order that you wrote, what we're seeking clarification on three points.

THE COURT: Yea.

ATTY. GATELY: One, whether or not Margaret Clifford should have given Mr. Livingston notice of this new mortgage encumbering his property.

THE COURT: As far as I'm concerned if the encumbrance is more than what the separation agreement [inaudible] which is the extra $30,000 as far as I can see, I'm using round figures, then I agree with you. She has to be responsible for that $30,000 so what will happen is when the house gets sold whatever the mortgage is, $160,000, whatever the number is, if it's down to $150,000, it gets paid from the proceeds. That equity is not the difference between $150,000 and the sales price, then that equity is going to be $30,000 added to the equity because she reduced the equity by $30,000.

ATTY. GATELY: I understand where you're going as far as that, Your Honor.

THE COURT: So...

MS. CLIFFORD-LIVINGSTON: I don't have a problem with that.

THE COURT: The question is, how is your client injured?

ATTY. GATELY: How is my client injured? First of all, Your Honor, he has the loan extended for 30 years. Second of all, he doesn't get...

MS. CLIFFORD-LIVINGSTON: We have to sell it in...

THE COURT: He's not on the loan.

ATTY. GATELY: Exactly.

THE COURT: His name is not on the loan.

ATTY. GATELY: Second, he's given no notice, Your Honor.

THE COURT: But I think…

VICTORIA SCHEPPS: Excuse me, number 10 of Your Honor's order...I'm sorry.

ATTY. GATELY: Third, Your Honor…

THE COURT: The second point, before you get to point three. He had notice in this sentence, it says the former wife shall have the right, this is paragraph 10 of the May 24 order, the former wife shall have the right to refinance the first and second mortgages with respect to the former marital home to satisfy the existing first and second mortgages and to pay outstanding marital debt if she so elects. I also gave her the right at her sole option to file for bankruptcy to eliminate the marital debt as the former husband is seeking.

ATTY. GATELY: So, is it your intention, Your Honor, that she, that at her, whether it be today or next year, that she has the right to go and take a new mortgage out…

THE COURT: That's right.

ATTY. GATELY: [Inaudible] without giving him any notice?

THE COURT: Yes, without getting…that's right, without getting a signature and without giving any notice because he's not obligated to pay the mortgage.

ATTY. GATELY: Your Honor, as long as that land is encumbered it effects his right to sell it.

THE COURT: It doesn't effect his right to sell it because it has to be sold by a certain date. He doesn't have a right to sell it prior to the emancipation of Brendan. And upon Brendan's emancipation he's got an absolute right to sell it whether his name is on the mortgage or not.

ATTY. GATELY: Understandably, Your Honor, if the house can be sold…

THE COURT: By the way, are both names on the deed?

ATTY. GATELY: Yes, Your Honor.

MS. CLIFFORD-LIVINGSTON: Yes.

THE COURT: So the bank was willing to give you a mortgage without his signature?

MS. CLIFFORD-LIVINGSTON: Right.

THE COURT: All right, well that was something they were willing to do.

MS. CLIFFORD-LIVINGSTON: Your Honor, in order to...

MR. LIVINGSTON: When I came before, at the last hearing, you had made it quite clear that you were taking in lieu of child support and making it child support.

THE COURT: Exactly.

MR. LIVINGSTON: And that the reason being is because…

THE COURT: Because you …

MR. LIVINGSTON: There was no lending institute that would loan her the money without my signature and that you were not going to require my signature.

THE COURT: Right.

MR. LIVINGSTON: And so you did Number 10 and you did Number 11. The banking institute took number 10 and 11, not as 10 and 11 but together as one and took that Margaret could refinance the property without my signature.

THE COURT: That's what I intended, that's exactly what I intended because otherwise there was no way of either one of you [inaudible].

MR. LIVINGSTON: And I'm still paying the same amount of child support that I paid for…

THE COURT: Well that's a separate issue. If you want to reduce the child support I'll, I mean, as far as I'm concerned I'm willing to consider a guideline order.

ATTY. GATELY: That will be the next issue before Your Honor.

THE COURT: But as far as I'm concerned she had an absolute right and the bank and a right to rely on it, to refinance the first and second mortgages without your permission because one of the [inaudible], my memory was that she had arranged several closings that you failed to attend the closings, I'm not getting into why, who or where and then the argument was that you were not eligible for lending because of the bankruptcy.

ATTY. GATELY: And because of his financial state, Your Honor. Now putting aside that, and I know…

THE COURT: So I said to her fine, if you want to go out and refinance it and you elect not to go into bankruptcy, you want to refinance it and put your name solely, obligate yourself to pay the mortgage exclusively with no obligation on the part of your husband that's fine, you have a right to do it. Instead of his paying the mortgage, which it was discharged in bankruptcy, he would then have the obligation to pay child support. He certainly doesn't get a free walk.

MR. LIVINGSTON: I've never looked for that.

THE COURT: I understand.

ATTY. GATELY: That's not what we're looking for.

THE COURT: I'll give you a chance [inaudible].

ATTY. GATELY: Now, with respect, when you say the $30,000 which is the difference between the marital debt and…

THE COURT: The mortgages.

ATTY. GATELY: Well, what's left, that goes back into it.

THE COURT: That goes back into the equity.

ATTY. GATELY: Is it your intention or is it your opinion that what will not come out of his, that will not go back into the house is his share of the marital debt which was discharged becoming her sole responsibility, becoming her sole responsibility and at her election how to decide.

THE COURT: That's an interesting question and I'll tell you the truth, I don't, I'm not going to rule on that today,

but it's an interesting issue because she was listed as a creditor as well and did she object to her…

ATTY. LEE: She received relief from the automatic stay, your Honor.

THE COURT: I know you got relief from the automatic stay, but…

ATTY. LEE: She couldn't afford an attorney, I mean, it's…

THE COURT: But she was discharged? I'll tell you what, I'm not going to deal with the debt. All I'm going to do is if in fact she got $30,000 additional dollars…

ATTY. LEE: Actually, Your Honor, she still has $25,000 joint credit card debts to pay off still so…

THE COURT: Still joint credit cards?

ATTY. LEE: Yea, I mean, she's already paid them but, you know, she wanted to pay the tuition and stuff.

MS. CLIFFORD-LIVINGSTON: Can I just…

ATTY. LEE: But she's still responsible for them.

THE COURT: She's responsible.

ATTY. GATELY: Your Honor, how do we deal with the issue that your specific order was to pay only marital debt and at least $10,000 of student loans which was non-marital debt was paid off.

MS. CLIFFORD-LIVINGSTON: That will come out…

**[TAPE ENDS HERE]**

# EXHIBIT F

# III. Unfair Or Deceptive Practices

## A. Federal Trade Act Requirements

The Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), generally prohibits unfair or deceptive acts or practices in or affecting commerce. The Federal Trade Commission (FTC), responsible for enforcement ‹ the FTC Act, has issued many trade regulation rules defining unfair or deceptive acts in specific kinds of transactions, including the Credit Practices Rule, 16 C.F.R. Part 444; the Holder Rule, 16 C.F.R. Part 43: the used car rule, 16 C.F.R. Part 455; and the rule establishing cooling off periods for door to door sales, C.F.R. Part 429.2. These rules include many restrictions on deceptive tactics that induce consumers to en into transactions.

Unfortunately, the FTC Act does not provide a private cause of action for consumers to enforce these rul The federal Truth in Lending Act also regulates advertisements regarding credit costs and terms, 15 U.S. §§ 1661-1665a; 12 C.F.R. §§ 226.16 and 226.24, but also lacks an explicit private right of action. Nonetheless, a violation of one of these federal statutes may constitute a violation of the Massachusetts Consumer Protection Act, G.L. c. 93A, described below.

## B. Chapter 93A - Massachusetts Consumer Protection Act

### 1. General

Like the FTC Act, the Massachusetts Consumer Protection Act (Chapter 93A), prohibits unfair and deceptive acts and practices. Chapter 93A is a powerful and important tool for practitioners who are considering the claims of clients on consumer related issues. Chapter 93A has been given abroad interpretation and provides a basis for courts to award treble damages. G.L. c. 93A, § 9(3). Even in instar where the defendant's conduct is not willful, Chapter 93A still allows for plaintiffs to obtain damages, an attorneys fees. G.L. c. 93A, § 9(4).

Massachusetts courts are "to be guided by" the Federal Trade Commission's interpretations of unfairness deception. G.L. c. 93A, § 2(b); Commonwealth v. Amcan Enterprises, 47 Mass. App. Ct. 330 (1999). According to the FTC, unfair conduct is that which:

- Offends public policy as established by statutes, the common law or any other concept of fairness;
- Is immoral, unethical, oppressive or unscrupulous; or
- Cause substantial injury to consumers

(Statement of Basis and Purpose of the Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking," 29 Fed. Reg. 8355, cited in F.T.C. Sperry & Hutchinson Co., 405 U.S. 233, 244-45 (1972)).

An act or practice is deceptive if it possesses a "tendency or capacity to deceive." Leardi v. Brown, 394 Mass. 151, 156 (1985). Deception is material under G.L. c. 93A if it "could reasonably be found to have caused a person to act differently from the way he would otherwise would have acted." Purity Supreme, v. Attorney General, 380 Mass. 762, 777 (1980), quoting Lowell Gas Co. v. Attorney General, 377 Mass 37, 51 (1979). Moreover, actual deception is unnecessary under Chapter 93A. Dalis v. Buyer Adverstisin

418 Mass. 220, 225 (1994)

## 2. Scope of Chapter 93A

There are specific areas and acts which have been defined by statute or case law as either falling within t scope of Chapter 93A or as being beyond its scope. Areas in which Chapter 93A plays an important role include:

- general disputes between business entities, ranging from small or routine matters to very substanti serious matters with large exposure, G.L. c. 93A, § 11;
- class action suits brought either in a business or consumer context, G.L. c. 93A, §§9(2) and 11;
- actions by the attorney general to restrain unfair methods of competition or unfair or deceptive acts practices that are harming the public interest, G.L. c. 93A, § 4;
- bad faith insurance practices, G.L. c. 176D; and
- consumer transactions, G.L. c. 93A, § 9, including creditors' debt collection practices and repossession.

Specific statutory prescriptions or acts that fall within the fall within the scope of Chapter 93A include:

- three-day right to cancel agreements consummated at a place other than the seller's place of busine G.L. c. 93, §§ 48 and 48F (this applies, for example, to door-to-door salespeople.);
- debt collection in an unfair, deceptive or unreasonable manner, G.L. c.93, § 49;
- consumer credit reporting, G.L. c. 93, §§ 50-67 and § 68;
- certification of title to mortgaged premises by lender's attorney, G.L. c. 93, § 70;
- regulation of sale of hearing aids, G.L. c. 93, §§ 71-75;
- health club services contracts, G.L. c. 93, §§ 78-88;
- plaintiff personal injury listings, G.L. c. 93, §§ 95-100;
- consumer credit cost disclosure, G.L. c. 140D;
- unfair methods of competition and unfair and deceptive acts and practices in the business of insura G.L. c. 176D;
- retail installment sales of motor vehicles, G.L. c. 255B;
- retail installment sales and services, G.L. c. 255D; and
- new car "lemon law," G.L. c. 90, § 7N1/2.

Other issues covered by Chapter 93A include, but are not limited to, tenant-landlord disputes, Leardi v. Brown, 394 Mass. 151, 474 N.E.2d 1094 (1985); and claims against attorneys, Brown v. Gerstein,17 Mass.App.Ct. 558, 569-70, (1984).

## 3. Limitations of Chapter 93A

Although Chapter 93A has broad application, there are limits. For example, only unfair or deceptive acts practices "in the conduct of trade or commerce" are subject to the prohibitions of Chapter 93A. G.L. c. 9: § 2(a).

The following are examples of areas are not covered by Chapter 93A:

- employer/employee disputes-claims by employees against their employers; do not fall within the coverage of Chapter 93A, Dorfman v. TDA Industries, Inc., 16 Mass.App.Ct. 714,720-21,455 N.E 457 461 (1983); Anzalone v. Massachusetts Bay Transportation Authority. 403 Mass. 119, 122, 52 N.E.2d 246, 248 (1988)(although bad faith is a key factor in those disputes), see, e.g., DeRose v. Putnam Management Co., 398 Mass. 205, 208-10, (1986)

- disputes relating to the private action of trustees, Edinburg v. Caver, 22 Mass.App.Ct. 212, 229 (1986);

- "transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States," G.L. c. 93A 3 (note that the burden of proving an exemption under this section is on the person claiming the exemption);

- transactions between members of the same legal entity, Doiron v. Castonguay, 401 Mass. 705, 706 (1988);

- suits against a noncommercial seller of a house, Lantner v. Carson, 374 Mass. 606,608 (1978);

- suits in areas where state-based claims are would be preempted by federal law; and

- municipalities.

## 4. Attorney General's Regulations

Pursuant to G.L. c. 93A, § 2(c), the attorney general is authorized to issue rules and regulations defining specific conduct that constitutes unfair methods of competition or unfair or deceptive acts or practices. These regulations issued by the attorney general do not exhaust the types of activities that are unfair or deceptive within the coverage of Chapter 93A, Purity Supreme, Inc. v. Attorney General, 380 Mass. 762. 778 (1980).

Two regulations of the attorney general in particular are broad and powerful and

should be considered in evaluating any consumer transaction:

- 940 C.M.R. § 3.05(1) prohibits claims or representations concern-ing any product or service which directly, or by omission, serves to deceive a buyer in any material respect.

- 940 C.M.R. § 3.16 states that an act or practice is in violation of Chapter 93A if
  - it is oppressive or unconscionable,
  - it fails to disclose material facts to a buyer,
  - it violates any statute, rule, regulation or law which is intended to protect the public's health, safety or welfare, or
  - it violates any federal consumer protection statute, including the Federal Trade Commission and the Federal Consumer Credit Protection Act.

Additionally, the attorney general has promulgated specific regulations at 940 C.M.R. dealing with the following subjects:

- false advertising and bait and switch schemes, 940 C.M.R. §§ 3.02, 3.03, 3.05(2) and 3.07;
- deceptive price claims or representations, 940 C.M.R. §§ 3.04 and 3.13;
- repairs and services and service contracts, 940 C.M.R. § 3.08;
- door-to-door sales and home-improvement transactions, 940 C.M.R. § 3.09;
- business and career schools and private home study, 940 C.M.R. §3.10;
- employment agencies and business schemes, 940 C.M.R. § 3.11;
- layaway plans, 940 C.M.R. § 3.12;
- refunds, returns and cancellations, 940 C.M.R. § 3.13(2);
- subscription and mail orders, 940 C.M.R. § 3.14;
- misrepresentation that a product or any pan thereof is new and failure to disclose that a product is u or contains used or reconditioned pans, 940 C.M.R. § 3.15(1);
- substitution of products, 940 C.M.R. § 3.15(2);
- failure to deliver goods or services, 940 C.M.R. § 3.15(3);
- landlord-tenant, 940 C.M.R. § 3.17;
- nursing homes, 940 C.M.R. § 4.00;
- motor vehicle advertising, sales and repairs and services, 940 C.M.R. § 5.00; and
- retail advertising, 940 C.M.R. § 6.00;
- handguns, 940 C.M.C. § 16.00;

- retail marketing and sale of electricity, 940 C.M.R. § 19.00.

G.L. c. 176D, § 3, also describes specific acts that violated Chapter 93A in the insurance context.

Actions may be brought by the attorney general to restrain unfair methods of competition or unfair or deceptive acts or practices that are harming the public interest, G.L. c. 93A, § 4.;

## 5. Remedies

Available remedies for consumers under Chapter 93A include treble damages, equitable relief, including injunction, and attorney's fees. G.L. c. 93A, § 9. For persons engaged in business transactions, remedies include actual damages or up to three, but not less than two, times the amount of actual damages for a wi or knowing violation of Chapter 93A, § 2. Attorney's fees are also available. G.L. c. 93A, § 11.

©Copyright 2004 www.MassLegalServices.org

# EXHIBIT G

**2. Statute of Limitations**

Both the Antitrust Act and Chapter 93A provide a four year statute of limitations. See G.L. c. 93, § 13 (Antitrust Act); G.L. c. 260, § 5A (consumer protection actions). The Antitrust Act, however, contains a statutory tolling provision which allows a civil action to be suspended during the pendency of, and for one year thereafter, of any civil or criminal proceeding brought by the Commonwealth. G.L. c. 93, § 13. A direct purchaser plaintiff, therefore, could commence an action under G.L. c. 93 despite an indirect purchaser's inability to do so under G.L. c. 93A, § 9. See In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation, 782 F. Supp. 481, 484 (C.D. Cal. 1991)(applying FTC Act)(actions brought to enforce prohibitions against unfair or deceptive business acts are not considered to be antitrust actions under the scope of the government tolling provisions).